The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   UNITED STATES OF AMERICA,        :
                                     :
4   vs.                              :   DOCKET NUMBER
                                     :   1:22-CR-361 & 362
5   KAYRICKA WORTHAM AND BRITTANY    :
    HUDSON,                          :
6                                    :   ATLANTA, GEORGIA
             DEFENDANTS.             :   FEBRUARY 1, 2023
7

8

9

10      **TRANSCRIPT OF AUDIO-RECORDED BOND REVOCATION HEARING**

11                        **PROCEEDINGS**

12        **BEFORE THE HONORABLE RUSSELL G. VINEYARD**

13            **UNITED STATES MAGISTRATE JUDGE**

14

15

16

17

18

19

20

21

22   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*
                    *TRANSCRIPT PRODUCED BY:*
23
    *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                    *2394 UNITED STATES COURTHOUSE*
                                      *75 TED TURNER DRIVE, SOUTHWEST*
25                                    *ATLANTA, GEORGIA  30303*
                                      *(404) 215-1383*

                  UNITED STATES DISTRICT COURT
                  OFFICIAL CERTIFIED TRANSCRIPT

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2
      FOR THE GOVERNMENT:
 3

 4          STEPHEN H. MCCLAIN
            UNITED STATES ATTORNEY'S OFFICE
 5

 6    FOR THE DEFENDANT KAYRICKA WORTHAM:

 7
            NICHOLAS A. LOTITO
 8          LOTITO & KIRSCHENBAUM

 9
      FOR THE DEFENDANT TIFFANY HUDSON:
10

11          L. BURTON FINLAYSON
            OFFICE OF L. BURTON FINLAYSON
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Loading...

1    **I N D E X   T O   P R O C E E D I N G S**

2

3       **WITNESS**                                              **PAGE**

ARNESHIA SCOTT

4

          Direct Examination
5           By Mr. McClain                                          6
          Cross-Examination
6           By Mr. Finlayson                                       34
          Cross-Examination
7           By Mr. Lotito                                          40
          Redirect Examination
8           By Mr. McClain                                         51
          Recross-Examination
9           By Mr. Finlayson                                       53

10   SPECIAL AGENT MATTHEW OLTMAN

11        Direct Examination
            By Mr. McClain                                         54
12        Cross-Examination
            By Mr. Lotito                                          65
13        Cross-Examination
            By Mr. Finlayson                                       68
14        Recross-Examination
            By Mr. Lotito                                          70
15

16       **WITNESS**                                              **PAGE**

KANDICE WILLIAMSON

17

          Direct Examination
18          By Mr. Finlayson                                       74
          Cross-Examination
19          By Mr. McClain                                         77

20                              * * *

21   CERTIFICATE                                                  126

22

23

24

25

```
 1              P R O C E E D I N G S

 2   (Atlanta, Fulton County, Georgia; February 1, 2023.)

 3              COURTROOM DEPUTY CLERK:  All rise.  This court is

 4   again in session.

 5              THE COURT:  Please be seated.

 6              These are the cases of the United States of America

 7   v. Kayricka Wortham, Case Number 1:22-CR-361, and United States

 8   of America v. Brittany Hudson, Case Number 1:22-CR-362.  We're

 9   here for a bond revocation hearing on the Government's motions

10   filed in these two cases.

11              Mr. McClain is here on behalf of the United States.

12   Mr. Finlayson on behalf of Ms. McClain {sic}, who is present.

13   Mr. Lotito on behalf of Ms. Wortham, who is present as well.

14              Mr. Lotito, let me start these proceedings -- I know

15   you filed a notice of appearance in the case.  You had

16   previously represented Ms. Wortham.  I conducted a hearing

17   after you were granted the opportunity to withdraw.

18              I just want to make sure you've had adequate time to

19   discuss the representation with her and that you are in the

20   case now going forward.

21              MR. LOTITO:  I have always wanted to say this.  I

22   keep trying to get out, but I get pulled back in.

23              We filed an entry of appearance this morning, Your

24   Honor.  And so I'm familiar with the case.  I could always use

25   more time on this bond revocation issue.  But, you know, we're
```

```
1    prepared to proceed.
2            THE COURT:  All right.  And you've had adequate time
3    to discuss it with Ms. Wortham?  Because I had her in court a
4    few weeks ago, as you may know.  And she discussed her right to
5    represent herself.  She elected to at that time.
6            But I just want to make sure she's consenting to your
7    proceeding today.
8            Have you had a chance to discuss that with her?
9            MR. LOTITO:  Yes.  And I know this is all -- this has
10   come up all of a sudden.  The motion suggests that we had a
11   falling-out.  We never really had a falling-out.  We had a good
12   relationship.  For whatever reason, she was persuaded to
13   proceed pro se based on some of the filings that she made.  I
14   withdrew with her, you know, suggestion and consent.  I'm back
15   in under the same basis.
16           THE COURT:  With her consent?
17           MR. LOTITO:  With her consent.
18           THE COURT:  All right.  Is that right, Ms. Wortham?
19           DEFENDANT WORTHAM:  Yes.
20           THE COURT:  All right.  Are you ready to proceed,
21   Mr. McClain?
22           MR. McCLAIN:  Yes, Your Honor.
23           THE COURT:  Counsel, are you ready?  Mr. Finlayson,
24   are you ready as well?
25           MR. FINLAYSON:  I'm ready, Your Honor.
```

```
 1              THE COURT:  You may proceed.
 2              MR. McCLAIN:  The Government calls Arneshia Scott.
 3              THE COURT:  Come forward.
 4              COURTROOM DEPUTY CLERK:  Please remain standing and
 5    raise your right hand to take the oath.
 6                        (Witness sworn)
 7              COURTROOM DEPUTY CLERK:  Please be seated and state
 8    and spell your name for the record.
 9              THE WITNESS:  Arneshia Scott.  A-R-N-E-S-H-I-A.
10    Scott, S-C-O-T-T.
11         Whereupon,
12                         ARNESHIA SCOTT,
13         after having been first duly sworn, testified as follows:
14                        DIRECT EXAMINATION
15    BY MR. MCCLAIN:
16    Q.   Good afternoon, Ms. Scott.  Where do you work?
17    A.   Cru Franchise Company.
18    Q.   And what are your job duties -- what is your job title
19    with Cru?
20    A.   Yes.  I'm the director of compliance, people, and
21    organization.
22    Q.   Okay.  And what does that mean your job duties are
23    day-to-day?
24    A.   Day-to-day, I monitor all locations to be in good standing
25    for our brand standards and compliance regulations.  I also
```

1    manage restaurants, the success once they open throughout that
2    time period.  Then I also open them up, get them the right
3    vendor via suggestions, and get them started.
4    **Q.**    And what is Cru?
5    **A.**    Cru is an urban hookah lounge in which we have a food
6    menu.  We serve alcohol, along with hookah.
7    **Q.**    How many locations approximately in the Atlanta area?
8    **A.**    In the Atlanta area, approximately about six currently.
9    **Q.**    And how does it work if someone wants to have a Cru
10    Lounge?  Is it you buy the building?  Is it a franchise?  Could
11    you describe for us how that works.
12    **A.**    Yes.  It is a franchise.  So they go through our
13    recruitment process in which we vet their financials and
14    stability to operate a Cru.  We also give them a discovery day,
15    basically an introduction to our company to see if we align.
16    **Q.**    And are you familiar with Kayricka Wortham and Brittany
17    Hudson?
18    **A.**    Yes, I am.
19    **Q.**    Do you see them in court today?
20    **A.**    Yes, I do.
21    **Q.**    And could you point them out and state something that they
22    are wearing.
23    **A.**    Okay.  Kayricka Dupree here, she has on a mask and a
24    blue -- Navy blue jumpsuit, I believe.  And Brittany Hudson
25    here, she has dreads with another mask and Navy blue.

```
 1          MR. McCLAIN:  And the record will reflect that the
 2   witness identified the defendants, Your Honor?
 3          THE COURT:  It will so reflect.
 4   Q.   (BY MR. McCLAIN)  How long have you -- and so you say you
 5   recognize them.
 6       Have you met with them in person?
 7   A.   Yes.
 8   Q.   And what was the reason that you were meeting with them in
 9   person?
10   A.   Well, I have met with them on several different occasions
11   in regards to the Midtown Glen Iris location that we have.  I
12   trained them.  I have met them in regards to vendors.
13          MR. FINLAYSON:  I'm sorry.  I'm going to have to
14   object.  I hate to interrupt.
15          But could we get clarification.  Them generally is a
16   bad thing since we have co-defendants.
17          THE WITNESS:  Okay.
18          MR. FINLAYSON:  If we could get who and who.
19          THE WITNESS:  Got you.
20          MR. FINLAYSON:  If it truly is both of them at the
21   same time, then that is what it is.  But I want to make sure
22   we're talking about who we're talking about.
23          THE WITNESS:  Uh-huh (affirmative).
24          THE COURT:  Mr. McClain, if you will just guide her
25   through that part of -- direct her, I guess.
```

1          MR. McCLAIN:  Okay.

2   **Q.   (BY MR. McCLAIN)**  Have you met with both of them in

3   person?

4   **A.**   Yes.  I met with Kayricka Dupree.  I have trained her.  I

5   have overseen some of her day-to-day functions in the site to

6   set up vendors and decor and organize the facility.

7       I have also met with Brittany Hudson in the same nature of

8   setting up vendors, organizing the decor, and things in the

9   site.

10  **Q.**   And just estimate for me if you can about how many times

11  have you met with Ms. Wortham in person.

12  **A.**   I would definitely say I have met with Ms. Wortham over 15

13  times.

14  **Q.**   What about Ms. Hudson?

15  **A.**   Ms. Hudson, just about the same.  Maybe over 12 times.

16  **Q.**   Okay.  And over the course of meeting them, did you have

17  conversations?

18  **A.**   Yes.

19  **Q.**   And based on those conversations, have you become familiar

20  with their voice?

21  **A.**   Yes.

22  **Q.**   Okay.  Over what -- when did you first start -- who did

23  you start dealing with first?  Ms. Wortham or Ms. Hudson?

24  **A.**   Ms. Wortham.

25  **Q.**   Okay.  And about when did that start?

1    **A.**    I met Ms. Wortham probably about two months ago I believe

2    when they -- the process of the Midtown Glen Iris location

3    begun.

4    **Q.**    Okay.  And so just tell us what was -- how was it that you

5    ended up starting to deal with her?  You were dealing with her

6    as part of your job at Cru?

7    **A.**    Yes.  I was assigned their account initially with the

8    assistance of a couple of other colleagues to oversee that they

9    received all of the information they needed and suggestions and

10    advice in order to set up that location or renovate that

11    location appropriately.

12    **Q.**    Okay.  So was Ms. Wortham trying to purchase a franchise

13    with Cru?

14    **A.**    Yes.

15    **Q.**    And you said that started a couple of months ago?

16    **A.**    Yes.

17    **Q.**    Okay.

18    **A.**    For that location, the Glen Iris location.

19    **Q.**    Okay.  So what about other locations?  Did you have prior

20    dealings with her prior to the Glen Iris location?

21    **A.**    I did not have day-to-day or consistent communication with

22    Ms. -- not Ms. Hudson -- Ms. Wortham before the Midtown

23    location.

24         They were -- initially Kayricka and her partner,

25    Demetrius, were originally assigned to the Buckhead territory

1  in which their communication was with another colleague as

2  their account manager.

3  **Q.**   And so is that what you were doing is being an account

4  manager?

5  **A.**   Yes.

6  **Q.**   Okay.  And what does an account manager for Cru do with

7  prospective franchisees?

8  **A.**   Just about everything from the initiation process; the

9  build-out process; site selection; and throughout the duration

10  of their contract, just managing the success of the restaurant.

11  **Q.**   Okay.  And so when you first met Ms. Wortham, was there a

12  particular location or locations that you were looking at for a

13  Cru Lounge?

14  **A.**   When I first met Ms. Wortham?

15  **Q.**   Yes.

16  **A.**   Yes.

17  **Q.**   Where was that?

18  **A.**   The Midtown Glen Iris location when I first met her.

19  **Q.**   Okay.  And then was there also a Buckhead location

20  involved at some point?

21  **A.**   Yes.  That was the first location that she was assigned to

22  or signed her agreement for.

23  **Q.**   Okay.  Did she pay any money for either of those

24  locations?

25  **A.**   Yes.

1   **Q.**   How much money did she pay?

2   **A.**   There was a 40,000-dollar franchise fee for the Buckhead

3   location and then another 40,000-dollar franchise fee for the

4   Midtown location.

5   **Q.**   Did she have any partners with either of those locations?

6   **A.**   Yes.

7   **Q.**   Who was her partner?

8   **A.**   Originally it was Demetrius Hines for the Buckhead

9   location, also for the Midtown location.

10      And then they wanted to transition to separate from

11  Mr. Hines and amended to include Brittany.

12  **Q.**   And so did the Buckhead location ever come to fruition?

13  **A.**   No.

14  **Q.**   Why not?

15  **A.**   They were having trouble finding a site.  Real estate was

16  pretty hard for them, the market.  So being that we had an

17  opportunity come up with a current location that was operating

18  and open and up for sale, we made that transition or proposal.

19  **Q.**   And the transition was to?

20  **A.**   Purchase the Midtown Glen Iris location.

21  **Q.**   Okay.  And Glen Iris, that is the street address for

22  the --

23  **A.**   Yes.

24  **Q.**   -- account location?

25  **A.**   Yes.  It is Glen Iris.  Uh-huh (affirmative).

Q.    Okay.  So did Ms. Wortham -- so there was already a
location on Glen Iris in Midtown --

A.    Yes.

Q.    -- that was Cru-oriented?

A.    Yes.

Q.    Okay.  Did Ms. Wortham ever sign any agreement with Cru
for that location?

A.    Yes.

Q.    And when approximately was that?

A.    That agreement was signed about December -- around early
December.

Q.    2022?

A.    Yes.  Yes.  And it initially was including Demetrius
Hines.  But then they proposed or came to us and wanted to
separate their agreement.  So it was only Kayricka who signed
the agreement.

Q.    Okay.  And did she pay any additional money in addition to
the 40,000 for that?

A.    No.  Well, I'm sorry.  Excuse me.  Yes.  Additional money
was for the location, which was originally $350,000.  But we
deducted 50,000 from that, in which dropped it down to 300,000.
And she did a down payment of 150,000.  And the rest -- the
remainder would be a note that she would have to pay monthly.

Q.    And so do you know over what period of time she had to pay
that remaining 150,000?

14

1    **A.**    No.  We didn't set a -- well, I'm not sure if there was

2    one set for a time frame.

3    **Q.**    Okay.  So as I understand it, there was a 40,000-dollar

4    payment and a 150,000-dollar payment.

5         Can you explain to us what the difference between those

6    two payments -- the purposes of them?

7    **A.**    Uh-huh (affirmative).  The franchise fee requires the

8    40,000-dollar fee.  And which that is solely to the franchisor

9    in order to establish the relations needed.  And then the

10   $150,000 was a portion towards purchasing that particular

11   franchise location.  So purchasing that location, Glen Iris,

12   because it is open and operating, it has value of customers,

13   value of decor, et cetera.

14   **Q.**    Did there come a time when Mr. Hines exited the picture on

15   the Midtown location?

16   **A.**    Just recently, yes.

17   **Q.**    How did that come to be?

18   **A.**    It was a conversation between me and Kayricka in which I

19   asked, you know, where is Mr. Hines and she informed me that he

20   is not a part of her Midtown -- excuse me -- Midtown deal.

21        And then I brought that information back to my team to

22   make sure that we separated ties appropriately from Mr. Hines

23   and got clarity on whether he would be a part of the Buckhead

24   territory still or whatnot.  So --

25   **Q.**    And did there come a time when Ms. Hudson entered the deal

1    to be partners with Ms. Wortham?

2    **A.**    Yes.  Yes.

3    **Q.**    Approximately when did that occur?

4    **A.**    Just recently within the last couple of weeks, Ms. Hudson

5    asked me a question of opportunity, whether there was another

6    location in Atlanta available.  She was wanting to pursue a

7    franchise as well.

8        So more into that conversation over probably the course of

9    a week, just discussing whether it would be a partnership with

10   her and Kayricka or would she pursue that solely.  And then

11   what came up as well is to partner or be on the paperwork for

12   Midtown location as well.  So in which we were going to pursue

13   an amendment to that agreement to include Ms. Hudson.

14   **Q.**    Okay.  And who were those discussions with?

15   **A.**    Ms. Hudson -- Ms. Brittany Hudson.  And then the last

16   conversation to confirm was with Ms. Kayricka.

17   **Q.**    And so after Ms. Hudson expressed an interest in a

18   different location and in partnering on the Midtown location,

19   did you take any action to pursue that?

20   **A.**    Yes.  Yes.  Standardwise, we asked for personal financial

21   statements.  It could be bank statements, along with a generic

22   personal financial template.  We asked that just to look at

23   their financial stability, see if there are any red flags

24   there.

25       We want to make sure that the franchisee is capable of,

16

```
1   you know, investing the amount of money needed in order for --
2   to operate the franchise location successfully.  So it requires
3   a lot of money throughout the time of opening and decor.  So we
4   asked for that.
5       We also, you know, do our due diligence period of them --
6   allowing them to read the agreements.
7           MR. McCLAIN:  Okay.  Your Honor, may I approach with
8   a collection of exhibits?
9           THE COURT:  You may.
10          MR. McCLAIN:  And I have a copy for the Court as
11  well.
12          THE COURT:  You can tender it up.
13  Q.   (BY MR. McCLAIN)  So you said you asked for financial
14  information from Ms. Hudson; is that correct?
15  A.   Yes.
16  Q.   All right.  I'm showing you what I have marked as
17  Government's Exhibit 3.  Start with Government's Exhibit 3.
18      Do you recognize Government's Exhibit 3?
19  A.   Yes.  These are the financial bank statements and the
20  financial -- personal financial statement that I requested for
21  Ms. Brittany Hudson.
22      And I also requested -- because they inquired to operate
23  the next location together as well, I required for Ms. Kayricka
24  to submit financial statements as well -- current.
25  Q.   Is this an email you received from Ms. --
```

1   **A.**   Yes, it was sent to me.

2         MR. McCLAIN:  The Government moves to admit

3   Exhibit 3.

4         MR. FINLAYSON:  I have no objections for this

5   hearing.

6         THE COURT:  It is admitted.

7   **Q.   (BY MR. McCLAIN)**  If we can look at Exhibit 3.  Well, just

8   on the front there where it says from and it has got DM

9   president, who is the president of Cru?

10  **A.**   I'm sorry.  I'm trying to locate --

11  **Q.**   This is Page 1 of Exhibit 3.

12  **A.**   Okay.

13  **Q.**   Just at the bottom where we redacted information just for

14  the email for the Court proceeding.

15  **A.**   Uh-huh (affirmative).

16  **Q.**   But it says DM president.  Who is the president of Cru?

17  **A.**   The president of Cru is Dennis McKinley.

18  **Q.**   Okay.  Is he your boss then?

19  **A.**   Yes.

20  **Q.**   All right.  So this email is from Dennis McKinley to the

21  Saunders Firm.

22       Who is counsel for Cru?

23  **A.**   Amber Saunders, the Saunders Firm.

24  **Q.**   If we look at Page 2 of this document, at the bottom

25  there, it says from Brittany Hudson.  There is a Yahoo address.

1    And it says to A-S.

2        Is that you?

3    **A.**    Yes.  Arneshia A. Scott.

4    **Q.**    And it says, please find attached the documentation for

5    both Kay and I.  Thank you, Brittany.

6        And so just to orient us, is this attaching the financial

7    documents that you had requested from Ms. Hudson?

8    **A.**    Yes.

9    **Q.**    All right.  If we look at page -- just a couple of pages

10   here.

11       Page 4 is a PenFed Credit Union page.

12       Do you see that?

13   **A.**    Yes.

14   **Q.**    At the top, it says Brittany Hudson.  It has a Parkwood

15   Circle address?

16   **A.**    Yes.

17   **Q.**    And it says total deposit accounts $307,886.37 there that

18   is about midway down.

19       Was that -- the fact that there were significant funds in

20   these accounts an important fact to Cru in going forward with

21   the franchise agreement?

22   **A.**    Yes, it is.

23   **Q.**    Why is it important that franchisees have significant

24   funds in the bank accounts?

25   **A.**    Well, it costs a lot as far as the breakdown of furnishing

1    the Cru, operating it on a day-to-day basis, inventory.  So

2    just wanted to make sure that we have a bunch of funds in order

3    to allocate to different areas.

4    **Q.**    And if that number really had been $7886.37 and this had

5    been altered to make it 307,000, is that the kind of

6    information that could have impacted Cru's decision whether to

7    move forward with this franchise?

8    **A.**    Yes.

9    **Q.**    If we go -- let's see -- one, two, three, four more pages

10   over, there is a Wells Fargo page.

11       Do you see that?  At the top, it says Brittany Hudson,

12   Parkwood Circle.

13   **A.**    Uh-huh (affirmative).

14   **Q.**    It is Page 8.

15   **A.**    Uh-huh (affirmative).  Yes.

16   **Q.**    And near the bottom there, it says ending balance on 1/18

17   $203,499.47.

18       Same question.  If this number was really $3499 that was

19   the real amount in the account and it had been altered to make

20   it 203,000, is that a piece of information that would have been

21   important in Cru's decision-making about how to move forward

22   with this franchise?

23   **A.**    Yes.  Very.

24   **Q.**    And then finally next to the last page, there is a

25   Fidelity Investment statement.  At the top, it says Kayricka

1     Dupree.

2          Do you see that?

3     **A.**     Yes.

4     **Q.**     And it claims there is an account value of $336,421.29 in

5     a Fidelity account in the name of Kayricka Dupree.

6          Same question.  If this account had significantly less

7     funds than that, would that be an important fact to Cru in its

8     decision-making process?

9     **A.**     Yes, sir.

10    **Q.**     Okay.  So after you received this -- this is dated

11    January 22nd.  So just a few days ago -- were you involved in

12    additional actions to kind of -- to get the location in midtown

13    opened?

14    **A.**     Yes.

15    **Q.**     Okay.  What were you doing in that regard?

16    **A.**     We were starting our hiring process in which we were

17    hiring staff and then going to implement training with the

18    tentative timeline to open on February -- the weekend -- the

19    first weekend of February.

20    **Q.**     And did you do anything as part of due diligence to get

21    that opening date started with the defendants?

22    **A.**     Yes.

23    **Q.**     What did you do?

24    **A.**     Well, we -- as far as this goes?

25    **Q.**     Well, any actions you took as due diligence to get that

1    deal started that weekend.

2    **A.**    Yes.  Okay.  Yeah.  So we, you know, sent a schedule to

3    the staff.  We notified the staff of, you know, what time to

4    report, attire.  We requested certain information from the

5    staff in order to prepare for their training and things.  And

6    then on the day of orientation was our last day meeting.

7    **Q.**    Did you do any research into the defendants as part of

8    that diligence process?

9    **A.**    Yes.

10   **Q.**    What did you do?

11   **A.**    Well, I actually was on the web searching just to look for

12   their other business ventures and just see what other

13   activities they are involved in.  And I came across a news

14   article in which stated all three of -- it stated Kayricka,

15   Brittany Hudson, and Demetrious Hines in the article.  And I

16   submitted the article to my boss, Mr. Dennis McKinley, and

17   asked him to look into it.  And then we submitted it to our

18   lawyer to proceed with questions.

19   **Q.**    Okay.  So after you found that article that said the

20   defendants had engaged in fraud with Amazon --

21   **A.**    Yes.

22   **Q.**    -- what did you do -- what steps did you take then after

23   you found the article after contacting the president?

24   **A.**    Yeah.  We contacted our lawyer in which she instructed

25   that we needed to conduct a meeting immediately to really dig

 1    in and ask our questions to see if we are even able to continue

 2    with the partnership with them and see where that may land.

 3        We also wanted to request more documentation or

 4    information about the case that they were involved in just

 5    again to ensure that we won't be affected and our company is

 6    safe in reputation.

 7    **Q.**    Were you involved in that -- so the lawyers had set up a

 8    call or meeting.

 9        Were you involved in setting up the call or the meeting?

10    **A.**    Yes.  Actually the day that orientation was scheduled, I

11    had came by to just look at the site and work on a couple of

12    issues with the POS system.

13        And that is when I confronted Brittany Hudson and

14    Ms. Kayricka Dupree and letting them know that something has

15    come to our attention that we really need to address.  I let

16    them know that we would have a Zoom call immediately tonight --

17    that night about 6:30.

18        And then I let them know that I would send them the Zoom

19    credentials -- well, the Zoom link immediately and if they

20    could be present.  So --

21    **Q.**    And that conversation you just described, was that in

22    person?

23    **A.**    Yes, that was in person.

24    **Q.**    Both defendants?

25    **A.**    Yes.

1   Q.    Okay.  And did you then, in fact, follow up with that

2   invitation -- a Zoom invitation?

3   A.    Yes.  I actually sent the Zoom invitation as soon as I got

4   to the car.

5   Q.    Where did you send those?  How did you -- did you -- by

6   email?  Like --

7   A.    By text.  So we are in a group chat with Ms. Kayricka

8   Dupree and Demetrius Hines with all of our other corporate

9   members.  And that is where I dropped the link for them to

10  join.  And then I text Brittany directly to her line and sent

11  her the link.

12  Q.    Did you, in fact, have the Zoom call?

13  A.    Yes.

14  Q.    Was that on January 23rd?

15  A.    Yes.

16  Q.    About what time was it?

17  A.    About 6:30 P.M.

18  Q.    Who all was on the call?

19  A.    It was Brittany Hudson.  It was Kayricka Dupree; Demetrius

20  Hines; Amber Saunders, our counsel; Dennis McKinley, our CEO;

21  Kara Wilson, our chief of operations; and Sakeissa Robinson,

22  another account manager.

23  Q.    And approximately how long did the call last?

24  A.    It lasted for about an hour.

25  Q.    And -- and so we're clear -- so this is a Zoom call.  Are

1  people's faces appearing on this Zoom call?

2  **A.**    They can.  But we didn't -- no one had their camera on at

3  the time.  So no faces were shown.

4  **Q.**    So what is appearing in place of faces?

5  **A.**    Whatever they registered or logged in to the Zoom with.

6  So it displayed their -- it would display their phone number,

7  if they just joined as a mobile member.  If they have an

8  account, it would display whatever name they have registered.

9  So yeah.

10  **Q.**    And so was -- was Ms. Hudson and Ms. Wortham on the same

11  box in the Zoom call, or did they each have a separate box?

12  **A.**    Separate box.  Everyone had a separate box.

13  **Q.**    Did everyone speak in the call?

14  **A.**    Yes.

15  **Q.**    Did you recognize the voices that were speaking on the

16  call?

17  **A.**    Yes.

18  **Q.**    And can you tell us whether the two defendants spoke on

19  the call?

20  **A.**    Yes.  They both spoke on the call.

21  **Q.**    Tell us what Ms. Wortham said during that Zoom call.

22  **A.**    Well, we started the Zoom call with my CEO just, you know,

23  giving an introduction and letting them know why we were

24  calling this meeting so urgently and postponing their schedule.

25      We then opened the floor for Kayricka, Demetrius, and

1  Brittany to speak.  The first person to speak was Demetrius

2  Hines.

3  **Q.**    Go ahead.  Tell us what Mr. Hines said first.

4  **A.**    Okay.  Well, Mr. Hines basically told us that there is a

5  case that is going on and that the involvement for him in the

6  franchise -- he was willing to remove himself from the

7  franchise agreement for Buckhead and the Midtown situation.

8      He also, you know, stated that they did plead -- he did

9  plead guilty and that the facts to the case are not as accurate

10  on the news reporting but he is involved.

11      And then Kayricka Dupree spoke.  She informed us that

12  there is no sentencing -- they won't be sentenced on the

13  upcoming March date.  She informed us that the case had been

14  transitioned to a private trust.  She informed us that she, you

15  know, won't be spending any, you know, time in jail for -- it

16  was someone that had her credentials for Amazon in which

17  affected her and she had no involvement in the criminal

18  activity.

19      She informed us that initially she was not able to gather

20  the documents needed in order to tell us whether she had -- the

21  plea of guilty had been recanted and everything had been

22  dropped and things.

23      And then she, again, in that same call told us that she

24  would send us over the documents that states that the case was

25  dropped, in a sense.

1    Q.    Okay.  And what about Ms. Hudson?  What did she say during

2    the call?

3    A.    Ms. Hudson did not confirm her involvement at a -- you

4    know, or confess to the involvement per se of the case.  It was

5    just by association.  She, you know, stated that her -- her

6    case is not moving forward; she won't be using or doing any

7    jail time; that she really does want to pursue the franchise

8    and be a part of the franchise.  So --

9    Q.    Okay.  Did she say anything about her case being dropped?

10   A.    I can't recall.

11   Q.    Okay.

12          MR. LOTITO:  Excuse me.  What was that?  Did she say

13   anything about what?

14          MR. MCCLAIN:  About her case being dropped.

15          MR. LOTITO:  Oh, okay.  Thanks.

16   Q.    (BY MR. MCCLAIN)  After that Zoom call -- okay.  Did

17   Mr. Hines -- let me ask you this.  Did Mr. Hines say anything

18   about whether the two defendants here were involved in the

19   crime?

20   A.    No.

21   Q.    Okay.  When you say no, did he --

22   A.    He didn't say that they were involved in the crime.  He

23   only spoke about his part, his situation.  And then -- so even

24   then with that it wasn't any detailed information to really

25   know if he was telling the truth or outside of what we read.

1    Q.    Okay.  After that Zoom call, did you have any

2    communications with either of the two defendants?

3    A.    Yes.

4    Q.    Okay.  Tell us about Ms. Hudson.

5    A.    Okay.  Immediately after the call that same night, I

6    received a text from Ms. Hudson in which she was apologetic

7    about the situation and still in the manner of confessing that

8    she wants to pursue Cru and she again apologizes and hopes that

9    she is able to continue.

10        Other days later, it was my first contact with

11    Ms. Kayricka in which I called her to let her know to reject

12    the order for Sysco, which was delivering food.

13    Q.    During the Zoom call, was there any discussion about

14    either of the defendants providing information about their

15    cases being dismissed?

16    A.    Yes.

17    Q.    Describe for us the nature of that discussion.

18    A.    Well, it was an exchange between Amber Saunders and

19    Kayricka in which Ms. Saunders was asking for documentation so

20    she could, you know, look into it and just make sure that

21    there -- she had recanted her plea, according to what she said,

22    and whether the case was dropped.

23    Q.    Was there any similar request made to Ms. Hudson --

24    A.    I can't --

25    Q.    -- about providing documents?

28

**A.**    I don't recall whether there was one -- whether the
language was said directly to Ms. Hudson.  But it was
generalized and requested that send me documents to say that
you guys are good with this case.

**Q.**    And after that call, did you observe an email where
Ms. Wortham provided such a document?

**A.**    Yes.

**Q.**    How was it that you observed that email?

**A.**    My boss, Dennis McKinley, he actually sent me a screenshot
to review the email.  The email wasn't sent to me.  It was sent
to Ms. Amber Saunders in which I had given Kayricka the email
for Ms. Saunders to send the information.

**Q.**    If you would take a look at Exhibit 1.

Do you recognize Exhibit 1?

**A.**    Yes.  It is the email.

MR. MCCLAIN:  The Government moves to admit
Exhibit 1.

THE COURT:  It is admitted.

MR. FINLAYSON:  No objection from me.

THE COURT:  Mr. Lotito?

MR. LOTITO:  Was this email sent to you?

THE WITNESS:  No, it wasn't sent to me.  It was sent
to -- well, I don't know who it was sent to actually.  But my
boss, Dennis McKinley, he sent it to me via text.  He
screenshotted the email for me and my team to review.

1          MR. LOTITO:  No objection.

2          THE COURT:  Government's 1 is admitted.

3          MR. MCCLAIN:  Your Honor, I'm also going to move to

4   admit Exhibit 2.  It is the attachment to Exhibit 1.  So it is

5   the same document.  I had attached it to the motion.

6          So the record is similar to the motion, I was going

7   to admit both Exhibit 1 and 2 as separate exhibits.

8          THE COURT:  Any objection to Government's Exhibit 2?

9          MR. FINLAYSON:  Not on behalf of Ms. Hudson.

10          MR. LOTITO:  No objection.

11          THE COURT:  It is admitted.

12   **Q.   (BY MR. MCCLAIN)**  And, Ms. Scott, if we can look at Page 2

13   of Exhibit 1, that email there.  It says, good evening and --

14   Amber Saunders is the counsel's name; correct?

15   **A.**   Yes.

16   **Q.**   It says, my apologies for the delay in sending this email.

17   I had to wait on the delivery of this document because it

18   exemplified and needs to be protected so I placed it in trusted

19   hands.  Three more lines down, it says, this case is a

20   difficult concept to understand because the prosecution jumped

21   the gun, attempted to take me down for something I didn't do.

22   Honestly scared me enough to force me to plea originally and

23   then had Demetrius come clean afterward but tried to still hold

24   my assets as his restitution.

25          When they thought I would go public with the information,

1    they tried to force me to sign an NDA in exchange for my assets

2    back.  I refused to sign their NDA and fired my attorney and

3    represented myself immediately afterwards because I could see

4    very clearly what was happening.

5        And then five more lines down, it says, since Brittany

6    never had any initial case movement, in addition to she and I

7    never having any involvement, they won't touch her case either

8    but sealed portions of it.

9        Next to the bottom line, she says, she's an MIT graduate.

10       And then on Page 3, it says, in short, they gave me all my

11   stuff back to hide the fact they were trying to bankroll my

12   estate.  And they issued a dismissal in chambers and

13   exemplified my copies so that I had something tangible to prove

14   my innocence because they refused to publicly take the loss

15   after they destroyed my character and had the nerve to try a

16   publicity stunt.

17       So is that consistent with what you had heard from her

18   verbally on the Zoom call?

19   **A.**   Yeah.

20   **Q.**   And the attachment there has a -- the next page says,

21   Kevin Weimer, U.S. District Court, Northern District of

22   Georgia, signed by judge and deputy clerk.  And then there is a

23   nol-pros signed by the prosecutor.

24       Were these documents, if true, important to Cru's

25   decision-making on how to move forward with the franchise?

1    **A.**    Yes.  Yes, it is.

2    **Q.**    And now does Cru believe they were forged?

3    **A.**    Yes.

4    **Q.**    And is that -- is that fact important to how Cru is going

5    to handle the franchise going forward?

6    **A.**    Yes.

7    **Q.**    Did you become aware that Ms. Hudson had also provided a

8    dismissal document to your boss in the course of your work?

9    **A.**    Yes.

10   **Q.**    How did you come to be aware of that?

11   **A.**    He sent it to me as well.

12   **Q.**    Okay.  And do you recall when he sent you that?

13   **A.**    No.  It definitely most likely was the same day as he

14   received it.

15   **Q.**    In looking at Exhibit 4, do you recognize Exhibit 4?

16   **A.**    Yes.

17   **Q.**    What is Exhibit 4?

18   **A.**    It is the document that Ms. Hudson submitted.

19          MR. MCCLAIN:  The Government moves to admit

20   Exhibit 4.

21          MR. FINLAYSON:  I guess I'm having trouble with the

22   last line because I don't believe this witness can know that

23   Ms. Hudson submitted it.

24          So I would have to -- I would have to object to any

25   foundation or, you know -- or authenticity, all those things.

1   I don't think this witness knows this.

2          THE COURT:  Mr. McClain?

3          MR. MCCLAIN:  Well -- okay.

4   **Q.   (BY MR. MCCLAIN)**  Did you receive a document from Dennis

5   McKinley --

6   **A.**   Yes.

7   **Q.**   -- where he said that there was an email from Ms. Hudson?

8   **A.**   Yes.

9   **Q.**   Is this that email?

10  **A.**   Yes.  He screenshotted it.

11         MR. MCCLAIN:  She's got personal knowledge that this

12  is what her boss represented to her was an email from

13  Mr. Hudson {sic}.  Hearsay, of course, is admissible in a bond

14  hearing under 3142(f) and also under Rule 1101 of the Rules of

15  Evidence.  And so there is no hearsay objection that is good.

16  Or at least the Court can consider it for its weight.  And she

17  has personal knowledge of what she's looking at and where she

18  got it from.

19         So I think the objection is hearsay, and that is not

20  a good objection in this setting.

21         MR. FINLAYSON:  Well, two things.  Hearsay is

22  admissible, but it has got to be reliable.  And I don't think

23  there has been a showing of reliability in terms of we know

24  this guy apparently is the owner of a company.  But we don't --

25  beyond that, we don't know anything about him.  Or, you know,

1    it is not like an agent who relies on his colleagues daily,

2    that kind of thing.

3            And then again, of course, the source of -- you know,

4    the source of the email, we don't know that either.

5            THE COURT:  The objection is overruled.  Government's

6    Exhibit 4 will be admitted.

7    **Q.  (BY MR. MCCLAIN)**  And Ms. Scott -- okay.  So Page 1 again,

8    this is from -- so the M is Dennis McKinley to the Saunders

9    Firm as counsel for Cru; correct?

10   **A.**   Yes.

11   **Q.**   And the second page says from Brittany Hudson to -- and it

12   says Dennis.  So that is Dennis McKinley, president of Cru; is

13   that right?

14   **A.**   Yes.

15   **Q.**   It says, again, I apologize.  I wouldn't never want to

16   jeopardize your brand.  It is dated January 27, 11:09.  And the

17   last page there, it says government's motion and order

18   dismissing case.  It has got a purported signature from Timothy

19   C. Batten, Sr., Chief United States District Judge.

20           And same question.  This document, if it were true, would

21   be important to the decision-making process with Cru and

22   handling the franchise?

23   **A.**   Yes.

24   **Q.**   And if it is forged, is that an important fact to Cru?

25   **A.**   Yes.

34

```
1              MR. MCCLAIN:  Okay.  Your Honor, I have no further
2    questions.
3              THE COURT:  All right.  Mr. Finlayson, do you want to
4    go first?
5              MR. FINLAYSON:  Sure.
6              THE COURT:  You may cross-examine.
7                        CROSS-EXAMINATION
8    BY MR. FINLAYSON:
9    Q.   So, Ms. Scott, as I understand it, originally there was a
10   franchise agreement with Ms. Wortham and Demetrius Hines?
11   A.   Uh-huh (affirmative).
12   Q.   To get the Buckhead location?
13   A.   Yes.
14   Q.   And Ms. Hudson was not a party to that at all?
15   A.   No.
16   Q.   And you mentioned, I guess, she first came into the mix
17   about two weeks ago; is that right?
18   A.   Who?  Ms. Hudson did?
19   Q.   Yeah.
20   A.   No.  Ms. Hudson has been in the mix with Ms. Kayricka
21   throughout the duration of their Midtown just renovation.  It
22   is to my understanding that she has been assisting her with
23   setting up vendors, making the phone calls and the accounts and
24   things, ordering.
25   Q.   Okay.  So what was two weeks ago?  I guess -- what
```

1    happened two weeks ago then?  You mentioned something was two

2    weeks ago.

3    **A.**    Yeah.  About two weeks ago was the whole hiring call

4    situation where we were -- we did a hiring call for staff and

5    then also just -- it was the time frame of Ms. Hudson inquiring

6    about another location, which is the Peters Street.  I

7    disclosed to her that that location is up for sale soon.

8    **Q.**    Did Ms. Hudson ever submit any applications or sign any

9    contracts with your company?

10   **A.**    No.

11   **Q.**    So she didn't have any agreement or anything in writing

12   that she signed with Cru at all?

13   **A.**    No.  During that time, it was still in the discussion

14   process where she proposed to partner with Kayricka on the

15   Midtown location and they requested an amendment to the

16   agreement to include Ms. Hudson's name on there.

17   **Q.**    So Ms. Wortham already had an agreement with Cru?

18   **A.**    Yes.

19   **Q.**    Okay.  And there was talk of Ms. Hudson maybe going on

20   that agreement?

21   **A.**    Yes.

22   **Q.**    But that never came -- never happened?

23   **A.**    No, it didn't happen.  It got stopped --

24   **Q.**    Okay.

25   **A.**    -- due to the discovery.

1    Q.    You provided some documents to the Government about the

2    Zoom call; is that correct?

3    A.    I provided it to our counsel, Ms. Amber Saunders, in which

4    she provided it to --

5    Q.    And you downloaded data from that Zoom call showing who

6    was on that call; right?

7    A.    Yes.  It allows -- it generates a report for calls that

8    are made on the account, in which when I located it, I was able

9    to submit to Amber.  It also allows for a recording function.

10   But we didn't record that meeting.

11   Q.    I'm going to hand up what I have marked as Defendant's

12   Exhibit 3.

13             THE COURT:  Can you make it Defendant Hudson just so

14   we're clear?

15             MR. FINLAYSON:  Yes.

16             THE COURT:  BH?

17             MR. FINLAYSON:  BH3.

18             THE COURT:  Thank you.

19   Q.    **(BY MR. FINLAYSON)**  And it is printed out in two pieces.

20   I hope you can line it up.

21         Does that look like that spreadsheet?

22   A.    Yes.

23   Q.    Okay.  And you got -- so you got initials on there for

24   various people that were on the call?

25   A.    Yes.

1    **Q.**    And you see BH there?

2    **A.**    Yes, I do.

3    **Q.**    And that is the document you provided to the Government

4    earlier; right?

5    **A.**    Yes.

6              MR. FINLAYSON:  Your Honor, I would move in

7    Defendant's BH3.

8              MR. MCCLAIN:  No objection.

9              THE COURT:  It is admitted.

10   **Q.    (BY MR. FINLAYSON)**  And, Ms. Scott, when you look there

11   for BH, you can see how long Ms. Hudson was on that call;

12   right?

13   **A.**    Yes.

14   **Q.**    How many minutes was she on that call?

15   **A.**    I'm sorry.  It only says the joined time or am I --

16   **Q.**    Go all the way out to the next side.

17   **A.**    The end time?

18   **Q.**    And then there's numbers of minutes on the call.  The

19   number is two.  Look for the two.

20   **A.**    I did not know that reflects minutes.

21   **Q.**    Okay.  Let me look at it.

22             MR. FINLAYSON:  May I approach, Your Honor?

23             THE COURT:  You may, yes, sir.

24   **Q.    (BY MR. FINLAYSON)**  Duration, that is the word.

25   Duration -- duration; right?  Do you see that?

38

1    **A.**    Uh-huh (affirmative).

2    **Q.**    It says duration.  It says two; right?

3    **A.**    Yes.

4    **Q.**    Those are minutes; right?

5    **A.**    Yes.

6    **Q.**    Okay.  Thank you.

7         So let me see if I can understand the Midtown situation.

8    You say the opening date was supposed to be in February?

9    **A.**    Yes.

10   **Q.**    I thought the original opening was like New Year's Eve or

11   something like that.

12   **A.**    New Year's Eve?

13   **Q.**    Yeah.

14   **A.**    No.

15   **Q.**    Or supposed to?

16   **A.**    Oh, well -- well, okay.  We originally thought the project

17   would take 30 days.  So that is what we were pushing for to

18   open immediately, just a 30-day down time.  And then it took

19   longer.

20        And I am the person who sets the time lines or gives the

21   tentative schedules.  And I never confirmed that we would make

22   that date.  I never submitted that timeline.  So --

23   **Q.**    Was there like a roof leak issue or something like that?

24   **A.**    There was a roof leak issue in which caused a few days of

25   delay for their contractors to complete work.

1    **Q.**    So who pays the rent on that space?

2    **A.**    Well, the -- we -- not we.  Dennis McKinley owns the unit

3    in which the new tenant, Kayricka, would be paying her rent to

4    him as he would be her landlord.

5    **Q.**    So she -- had she paid that rent already?

6    **A.**    I'm not sure.

7    **Q.**    You don't have any reason to believe she had not, do you?

8    **A.**    No, I don't have any reason to believe.

9          Do --

10   **Q.**    I'm sorry?

11   **A.**    Do I say anything when there is no question?

12   **Q.**    No.  I'm looking to see if I have any more questions.  I

13   may be done.

14   **A.**    Okay.

15   **Q.**    You mentioned you did not record that call on the Zoom?

16   **A.**    I didn't.  But it does state here that Ms. Brittany Hudson

17   is listed twice on here.  And the next set of minutes was for

18   33.

19   **Q.**    Let me see that.  Down at the bottom?

20   **A.**    Yes.

21   **Q.**    So you mentioned in that call it sounded like it was -- it

22   started out with Demetrius in that call; right?

23   **A.**    Well, it started out meaning he was the first person to

24   speak -- Demetrius was.

25   **Q.**    And he said that he had pled guilty and that he was

```
 1   involved in the Amazon scheme?
 2   A.   Yes.
 3   Q.   And then I think you mentioned with regard to Ms. Hudson
 4   you -- you didn't have specific recollection about documents
 5   being requested about dismissal?
 6   A.   It was a general request.
 7            MR. FINLAYSON:  That's all my questions, Judge.
 8   Thank you.
 9            THE COURT:  Mr. Lotito, you may cross-examine.
10               (There was a brief pause in the proceedings.)
11            MR. LOTITO:  Excuse me, Your Honor.
12            THE COURT:  Yes, sir.  Are you ready to proceed?
13                        CROSS-EXAMINATION
14   BY MR. LOTITO:
15   Q.   Hi, Ms. Scott.  I'm Nick Lotito, and I represent
16   Ms. Wortham.
17        We have never met before?
18   A.   No.
19   Q.   Okay.  So you are familiar with the documents that Cru
20   Lounge uses with its prospective franchisees?
21   A.   Yes.
22   Q.   And Ms. Wortham signed some of those documents.
23        Are you familiar with the documents that she actually
24   signed?
25   A.   Yes.
```

41

| | |
|---|---|
| 1 | MR. LOTITO:  May I approach, Your Honor? |
| 2 | THE COURT:  You may. |
| 3 | **Q.    (BY MR. LOTITO)**  I have three documents here:  An asset |
| 4 | purchase agreement, the license and management agreement, and |
| 5 | the secured promissory note.  And I have labeled those as |
| 6 | Defendant's Exhibit KW1, 2, and 3. |
| 7 | You just look at them if you would and then see if you can |
| 8 | identify those. |
| 9 | **A.**    Yes. |
| 10 | **Q.**    Okay.  And are those the documents that Kayricka Wortham |
| 11 | signed in connection with her business relationship with Cru |
| 12 | Lounge? |
| 13 | **A.**    These are the documents she signed in relation to her |
| 14 | purchase of that location as it states, the lease and |
| 15 | promissory note and things. |
| 16 | There is also a document -- another document that is |
| 17 | signed, which is the franchise agreement.  And that is directly |
| 18 | relating to the franchise. |
| 19 | **Q.**    Okay.  We'll talk about that in a minute. |
| 20 | MR. LOTITO:  I would like to admit Exhibits KW1, 2, |
| 21 | and 3, Your Honor. |
| 22 | MR. MCCLAIN:  No objection. |
| 23 | THE COURT:  Those are admitted. |
| 24 | **Q.    (BY MR. LOTITO)**  Okay.  So I think you had touched on |
| 25 | this.  The asset purchase agreement is a little different for |

42

1   Ms. Wortham than your normal franchisee because she was

2   actually buying a location that the owner, Mr. McKinley, had --

3   that was the first location for Cru Lounge; is that right?

4   **A.**   Yes.  First location.  And it was operating.

5   **Q.**   So she dealt with him initially and developed a

6   relationship and then wound up being offered this particular

7   location to operate?

8   **A.**   No.  She dealt with my colleague, Kara Wilson, initially

9   in which Kara presented the opportunity for the Midtown

10  location in which Dennis McKinley, the president, was okay with

11  presenting that opportunity, being that they weren't having

12  success in Buckhead.

13  **Q.**   Okay.  And so for that, she paid a 40,000-dollar franchise

14  fee?

15  **A.**   Yes.

16  **Q.**   And she paid a 150,000-dollar fee to purchase the

17  location?

18  **A.**   Yes.

19  **Q.**   And then she also signed the agreement that required

20  monthly payments for five years on the lease?

21  **A.**   Yes.

22  **Q.**   Is that right?

23      And I think when Mr. Finlayson was questioning you, you

24  weren't aware of what payments that -- would you accept that

25  she paid $30,000?  The first and last month's rent, and two

43

1   months in advance, $7500 each, for a total of $30,000 toward

2   the rental?  Does that sound --

3   **A.**   That was the only payment that I didn't have insider

4   information on.  The only two payments that I had insider

5   information on was the franchise fee and the $150,000.

6   **Q.**   But are you aware that the payments were made?

7   **A.**   Yes.

8   **Q.**   Okay.  Now, you mentioned the franchise agreement.

9        Are you aware that Ms. Wortham -- there was discussions

10  about a franchise agreement but a franchise agreement was never

11  signed by her?

12  **A.**   I'm aware that there was a process to making sure that she

13  signed the franchise agreement, yes.

14  **Q.**   But that has never happened yet?

15  **A.**   I did not discover that it didn't happen yet.  I actually

16  go by what the counsel says as far as if they have discussed

17  the franchise agreement and then I get it.  Or if I request it,

18  I get to view it.

19  **Q.**   But you haven't seen a franchise agreement that has been

20  signed by Ms. Wortham?

21  **A.**   No.

22  **Q.**   And as far as you know, no franchise agreement has

23  actually been signed?

24  **A.**   Yes.  The only franchise agreement that has been signed

25  that I saw -- it was the Buckhead.

44

1    **Q.**    Okay.  And that was the one that involved Demetrius and

2    Ms. Wortham?

3    **A.**    Yes.

4    **Q.**    Okay.  Who is Sakeissa?

5    **A.**    Sakeissa -- Sakeissa Robinson is the newest member of our

6    corporate team.  She's another account manager in which I was

7    transitioning her to take on the Midtown Glen Iris location to

8    be Kayricka -- Kayricka's account manager instead of me.

9    **Q.**    Okay.  Is -- and I think you indicated that Sakeissa was

10    on the Zoom call?

11    **A.**    Yes.

12    **Q.**    And is Sakeissa someone that was a franchisee at one time?

13    She had a franchise in Lilburn?

14    **A.**    Yes.

15    **Q.**    And that franchise, I think, burned down?

16    **A.**    No.

17    **Q.**    It didn't?

18    **A.**    No.  No.  They had troubles with licensing as far as being

19    able to implement all of our products in their site.  So it

20    ended up having to close.

21    **Q.**    Okay.  So she doesn't -- she doesn't have a franchise

22    location now?

23    **A.**    No.

24    **Q.**    Is there -- have there been discussions that she's going

25    to take over the Midtown location?

```
 1   A.    No.

 2   Q.    You're not aware of any discussions like that?

 3   A.    No.

 4   Q.    When -- were you present when these Amazon charges were

 5   brought up with Ms. Wortham in January?

 6   A.    Yes.

 7   Q.    And did she offer to Mr. McKinley, do you want me to back

 8   out?  Do you recall her saying that?

 9   A.    No.

10   Q.    And so it is -- it is your understanding that Ms. Hudson

11   was interested in this -- in a possible franchise on Peters

12   Street?

13   A.    Uh-huh (affirmative).

14   Q.    And that is something that came up in the last couple of

15   weeks?

16   A.    Yeah.

17   Q.    What email address did you deal with when you -- when you

18   contacted Ms. Wortham?  Do you know?

19   A.    Well, I used my company email address for anything

20   regarding Cru.  So most likely it was ascott@cruhemp.com.

21   Q.    And what email address -- did you use an email address

22   kayrickadupree@icloud.com in communicating with Ms. Dupree or

23   Ms. Wortham?

24   A.    I'm not sure.  Once I establish the locations company

25   email, I tend to CC their personal email.  But I don't know
```

1   verbatim how her personal email is listed.

2   **Q.**   Okay.  So the idea of -- one of your responsibilities is

3   vetting financials.

4        That wasn't really necessary here with Kayricka because

5   she had already been vetted and paid the franchise fee and the

6   150,000-dollar fee and she was really onboard ready to open

7   this location?  But for some problem with the ceiling or

8   something, it would have opened even earlier than it did and

9   that required additional renovations; right?

10  **A.**   It increased the current renovations, I would say.  I

11  think it made complications with the flooring that they were

12  applying that same week.

13       And as far as the -- excuse me.  Your initial statement

14  with that was about?

15  **Q.**   She had been vetted already.  I mean, she had already paid

16  the money.

17  **A.**   Yeah.  We had requested additional -- well, we requested

18  current financial statements due to she had already been in the

19  process of spending a lot of funds for the current location.

20  So we wanted to see how could you, you know, possibly, you

21  know, be an asset to this new agreement.  For the Peters Street

22  location, would you be financially stable?  Are you currently

23  in hardship from your investment at the Midtown location?

24       So that is why we requested current.

25  **Q.**   Okay.  And you talked about renovating the location, and I

1    think you just testified.  I mean, she spent a great deal of

2    her time and money preparing the Midtown location for its

3    opening, which was imminent at the time all this came up about

4    the Amazon case?

5    **A.**    It is expected.  It is required.  Most of our

6    franchisees -- it turns into a full-time to set up and initiate

7    and make sure that they are able to open by their opening date.

8    **Q.**    And she was meeting your requirements?  I mean, she was

9    doing what you expect a franchisee to do?

10    **A.**    Yep.

11    **Q.**    Okay.  You talked about the Buckhead location.  That

12    never -- I mean, that was a possibility, but there was never a

13    location found to open up an actual Cru Lounge there?

14    **A.**    Right.  So we -- how we do -- we -- franchise agreements

15    are assigned to territories.  So they were -- they picked the

16    Buckhead territory.  And they weren't able to find a physical

17    building in order to begin that build-out and opening process.

18    **Q.**    Okay.  And so is there a waiting period for when somebody

19    asks for a franchise from the time they request it to the time

20    that they -- what is the waiting period before you could

21    actually open a franchise?

22    **A.**    They have to hold the FDD and franchise agreement for

23    several days.  So that is the due diligence period in itself.

24    There is also a period of just conversations and meetings just

25    to get the -- what can I say? -- just to get the background on

1    the prospect.

2        And then there's -- everyone's opening time frame once

3    they sign to open -- it differs.  We usually give -- we buffer

4    it on the contract for a year.  But it can be anywhere from as

5    fast as two to three months to as long as six months to a year.

6    **Q.**   And Ms. Wortham had gone through this process for a number

7    of months before she got to the point where she was about to

8    open a location -- the Midtown location?

9    **A.**   Yeah.  She originally went through the process for

10   Buckhead.  And then Midtown -- some things didn't have to be

11   repeated because she had already been in the process.

12   **Q.**   So if someone like Ms. Hudson were going to partner with,

13   say, Ms. Wortham who had already had a franchise, would that

14   shorten the period that she would have to wait to do -- to be

15   able to get a franchise on Peters Street if she were partnering

16   with an existing franchisee?

17   **A.**   Repeat that question one more time.

18   **Q.**   Would it shorten the waiting period for somebody that is

19   coming new to Cru Lounge if they were partnering with an

20   existing franchisee like Ms. Wortham?

21       That was probably an inartful question.

22   **A.**   No.  No.  It necessarily wouldn't shorten.  But it would

23   benefit because they would have the access -- well, in their

24   situation, Brittany would have the access to the open Midtown

25   location under Kayricka to study and practice as she was going

49

1    to assume a manager -- managerial role.

2        So it is no -- there is no certainty on whether it would

3    shorten the timeline because we still had other procedures to

4    go through as far as the current owners coming up with an

5    official price, contracts, and things of that nature.

6    **Q.**   Okay.  Exhibit 3 that you were shown, which were the

7    records that were sent by Ms. Hudson, those included a Pen

8    Federal Credit statement that showed a balance.  It is one of

9    those documents.

10            THE COURT:  Are you referring to Government's

11   Exhibit 3?

12            MR. LOTITO:  Government's Exhibit 3, yes.  Thank you.

13   **A.**   Yes.

14   **Q.   (BY MR. LOTITO)**  And there was a Wells Fargo document, and

15   that was for Evolve & Elevate, and that was the company name

16   that Ms. Wortham was using?

17   **A.**   Yes.  That was the business entity that was -- is owned by

18   Ms. Wortham that we were licensing for --

19   **Q.**   Okay.

20   **A.**   -- to use the trademark.

21   **Q.**   And that is the one that Ms. Hudson wanted to partner

22   with?

23   **A.**   Say it one more time.

24   **Q.**   That is the entity that Ms. Hudson wanted to partner with

25   for Peters Street?

1    **A.**    Well, during our discussions, I posed the question as to

2    whether -- yes, would she be partnering with Evolve & Elevate

3    or would you guys -- and also for the Peters Street location,

4    would you guys develop a different entity, different LLC for

5    that business to be separate.

6    **Q.**    And then the Fidelity account that was sent by Ms. Hudson,

7    that also related to Ms. Wortham?  That's one of the

8    attachments to Government's Exhibit 3.

9    **A.**    Yes.

10   **Q.**    Is that right?  You are still looking?

11   **A.**    Yes.  I'm sorry.

12           THE COURT:  Are you referring to the next to the last

13   page of Government's Exhibit 3?  Is that what you are directing

14   her to?

15           MR. LOTITO:  The Fidelity --

16   **A.**    Okay.  Sorry.  I found it.

17   **Q.**    **(BY MR. LOTITO)**  And that is something that purports to be

18   from Ms. Wortham?

19   **A.**    Yes.

20   **Q.**    But sent by Ms. Hudson?

21   **A.**    Yes.

22   **Q.**    So you don't -- do you not have any record of what email

23   address you have used for Ms. Wortham when you communicated

24   with her?

25   **A.**    Record in my emails.  But not --

1    **Q.**    Not --

2    **A.**    -- verbatim to, I guess, spell out.

3              MR. LOTITO:  One second, Your Honor.

4              THE COURT:  Yes, sir.

5                   **(There was a brief pause in the proceedings.)**

6    **Q.    (BY MR. LOTITO)**  You have always known Ms. Wortham as

7    Kayricka Wortham, I take it?

8    **A.**    Initially, yes, Kayricka Wortham.  But in conversation, it

9    is Kayricka Dupree or KD.

10   **Q.**    Have you ever used an email k.dupree in communicating with

11   Ms. Wortham?

12   **A.**    I don't recall.  I don't know for sure.  I mean, most

13   emails -- I don't want to be generic.  Most emails are with the

14   name, so --

15             MR. LOTITO:  Okay.  All right.  Thank you.

16             THE WITNESS:  Okay.

17             THE COURT:  Any redirect, Mr. McClain?

18             MR. MCCLAIN:  Just one topic, Your Honor.  May I

19   approach to --

20             THE COURT:  You may.

21             MR. MCCLAIN:  -- look at Defendant's Exhibit 1?

22             THE COURT:  Yes, sir.

23                        REDIRECT EXAMINATION

24   BY MR. MCCLAIN:

25   **Q.**    All right.  So I'm looking at, it looks like, Defendant's

52

1    Exhibit 3 of Ms. Hudson.  And Mr. Finlayson had pointed out the

2    BH column that says duration two.  And you had pointed out the

3    last -- the last row also says BH.

4        What is the duration of that?

5    **A.**    33.

6    **Q.**    And the 33 plus 2 adds up to 35; right?

7        And what number is by all the other participants of that

8    call?

9    **A.**    35.

10   **Q.**    All right.  So assuming that means 35 minutes, is that

11   consistent with your memory?

12       I think you estimated how long you thought the call was.

13   Is 35 minutes consistent with your memory of how long the call

14   was?

15   **A.**    Yeah.  I mean, I was in the car when I took the call.  So

16   it felt like an hour.  But yeah, it was a call lengthy enough

17   to be 35 minutes.

18   **Q.**    And is it your memory that each of the participants were

19   on the call the same amount of time?

20   **A.**    Yes.

21            MR. MCCLAIN:  Okay.  That is all I have, Your Honor.

22            MR. FINLAYSON:  Very briefly.

23            THE COURT:  On that point?

24            MR. FINLAYSON:  It is really not on that point.  It

25   would be something that came up in Mr. Lotito's cross.

```
 1              THE COURT:  All right.

 2              MR. FINLAYSON:  Thank you.

 3                        RECROSS-EXAMINATION

 4   BY MR. FINLAYSON:

 5   Q.   It was Ms. Wortham that was buying the Midtown location;

 6   right?

 7   A.   Yes.

 8   Q.   And she was actually buying the whole building?  In other

 9   words, the unit -- was she getting the unit?

10   A.   No.  Just the franchise.

11   Q.   Just the franchise.

12        And Ms. Hudson was not buying that franchise?

13   A.   No.

14   Q.   Okay.  And, again, she never signed any paperwork to buy

15   anything from you?

16   A.   No.  It was only conversations to project.

17              MR. FINLAYSON:  Okay.  Thank you.

18              THE COURT:  All right.  Anything else for Ms. Scott?

19              MR. MCCLAIN:  No, Your Honor.

20              THE COURT:  May she be excused?

21              MR. MCCLAIN:  Yes, Your Honor.

22              MR. LOTITO:  Yes.

23              THE COURT:  Ms. Scott, you are excused.

24              THE WITNESS:  Do I leave these here?

25              THE COURT:  You can leave them there, yes.  That
```

```
 1    would be great.

 2            Do you have another witness to call?

 3            MR. MCCLAIN:  One more, Your Honor.  Matt Oltman.

 4            THE COURT:  All right.

 5                    (Witness sworn)

 6            COURTROOM DEPUTY CLERK:  Please be seated and state

 7    and spell your name for the record.

 8            THE WITNESS:  My name is Matthew Oltman.

 9    M-A-T-T-H-E-W.  Oltman, O-L-T-M-A-N.

10        Whereupon,

11                    SPECIAL AGENT MATTHEW OLTMAN,

12        after having been first duly sworn, testified as follows:

13                        DIRECT EXAMINATION

14    BY MR. MCCLAIN:

15    Q.    Where do you work?

16    A.    I'm a special agent with the United States Secret Service.

17    I work here in Atlanta.

18    Q.    What are your job duties as it relates to fraud cases?

19    A.    I'm a federal criminal investigator.  The Secret Service

20    has jurisdiction over financial crimes.

21    Q.    Are you the case agent on this case?

22    A.    I am not the original case agent, but I took over a case

23    agent who transferred to Washington, D.C.

24    Q.    And you are familiar with the defendants, Kayricka Wortham

25    and Brittany Hudson?
```

1    **A.**    Yes, I am.

2    **Q.**    All right.  Let me direct you to Government's Exhibit 3.

3    It should be in front of you there.  And if you could go to

4    Page 4.

5         Okay.  That is a PenFed Credit Union statement?

6    **A.**    Yes, it is.

7    **Q.**    And you see it says Brittany Hudson at the top, Parkwood

8    Circle, and it has an amount that is midway down the page that

9    says total deposit accounts $307,886.37?

10   **A.**    Yes.

11   **Q.**    Did Secret Service take any actions to confirm whether

12   that number was accurate?

13   **A.**    We did.  We have an investigative analyst, Betty Stewart,

14   who is a retired IRS agent.  And she has numerous contacts with

15   the banks, and she sent this exact statement to contacts at

16   PenFed.

17   **Q.**    What did PenFed say about the authenticity of this

18   statement?

19   **A.**    They said it is inaccurate.  It was altered.  The 3-0 was

20   added to the account.  The actual account would just be the

21   $7886.37.  The 3-0 was an alteration.

22   **Q.**    Okay.  If we go to Page 8, which is the -- it is a Wells

23   Fargo statement.  It says Brittany Hudson at the top, Parkwood

24   Circle, Atlanta.  Toward the bottom of the page, it has ending

25   balance 1/18, $203,499.47.

56

1      Did Secret Service take any actions to determine whether

2  this statement was authentic?

3  **A.**   We did.  We took the same actions and received

4  confirmation from Wells Fargo that this statement was also

5  altered in the same manner the 2-0 was added to the account to

6  represent 203,499.47 when the account was $3499.

7  **Q.**   You can go four more pages over.  So this is the third

8  page from the end.  It is a Wells Fargo statement, Evolve &

9  Elevate, Inc.  It has an ending -- this one --

10      Well, do you have an understanding of who is associated

11  with Evolve & Elevate, Inc.?

12  **A.**   Yes, I do.  That business belongs to Ms. Wortham.

13  **Q.**   Okay.  And toward the bottom of this page, it says, ending

14  balance December 31, $3,132,877.28.

15      Did Secret Service take any steps to determine if that

16  balance was actually in this account?

17  **A.**   We did.  Wells Fargo provided us that there were three

18  accounts belonging to Evolve & Elevate under Ms. Wortham.  And

19  the first account was approximately $10,000.  The second

20  account was approximately $9000.  And the third account was

21  approximately $160,000.  So nowhere near the 3,132,000-dollar

22  number.

23  **Q.**   If you go to the next page, it is a Fidelity Investments.

24  So this is the second page from the back.  Fidelity

25  Investments, Kayricka Dupree.  It says, Dear Kayricka Dupree,

1   please accept this letter as confirmation of the account value

2   as of January 20, 2023, and it says $336,421.29 is the account

3   value.

4       Same question:  Did Secret Service take any steps to make

5   any determinations about the authenticity of this document?

6   **A.**   We did.  We contacted Fidelity, and they did not confirm

7   an exact amount.  But they did confirm that this amount was

8   greatly inflated and nowhere near the accurate account.

9   **Q.**   And did they say what they needed to --

10  **A.**   Without subpoena, they wouldn't provide an exact dollar

11  amount.  They would just confirm that this was not an authentic

12  account and that number was greatly exaggerated.

13  **Q.**   Okay.  So let me now direct you to January 27, 2023.

14      Were you involved in the arrest of the two defendants?

15  **A.**   I was.

16  **Q.**   Describe for us a little bit how that was accomplished.

17  **A.**   The situation with Cru Franchising came to our attention

18  that Wednesday.  That was the first we had been made aware of

19  the attempts by Ms. Wortham and Ms. Hudson to acquire the

20  franchise.

21      We were contacted by their corporate general counsel,

22  Ms. Amber Saunders.  She actually -- she was made aware of the

23  article.  She contacted the U.S. Attorney's Office press agent

24  or public affairs agent who forwarded on the concern to AUSA

25  Steve McClain.  AUSA McClain contacted me.  And I reached out

1    to Ms. Saunders.

2        From there, she painted the picture of the process that

3    they were undergoing to obtain the franchise agreement and then

4    asked about whether or not the charges were accurate and

5    pending; what they read, which was actually the press release

6    from the U.S. Attorney's Office was accurate.  And I confirmed

7    that it was.  And then they shared further details as to

8    obtaining court documents that said the contrary.  That said

9    they were free and clear of any charges.

10        Ms. Saunders provided those documents in an email.  The

11   first email was strictly for Ms. Wortham.  It was the email

12   that you read excerpts from earlier and an attached document

13   that purported to be authentic from this court.

14   **Q.**   Let's focus on the morning of January 27th, the day of the

15   arrest.

16   **A.**   Okay.

17   **Q.**   Were you involved in the discussions that led to an arrest

18   that occurred at 11 --

19   **A.**   Yes.

20   **Q.**   Describe for us any communications that led to that

21   operation -- that arrest operation.

22   **A.**   Understood.  I had been in communication with Ms. Amber

23   Saunders, counsel for Cru.  And she confirmed that a meeting

24   was scheduled at the Glen Iris address, the Cru Midtown

25   location where both parties -- both Ms. Hudson and Ms. Wortham

59

1    would be present.

2        I had in my possession active arrest warrants for both.  I

3    contacted the U.S. Marshals Service.  And special agents from

4    the Marshals Service and myself set up a plan to be on-site the

5    morning of, Friday morning.  And we received positive

6    confirmation from inside the location that both parties were

7    inside.  And we arrived on scene and placed both individuals

8    under arrest.

9    **Q.**    Do you know whether Ms. Hudson was asked to provide any

10   proof of her case being dismissed prior to that meeting at

11   11:00 A.M.?

12   **A.**    The corporate counsel said they had received a document

13   from Ms. Wortham, and they reminded Ms. Hudson that they still

14   needed a document that she claimed to have if they were going

15   to proceed further.

16       Minutes before she arrived at the location, I received an

17   email from Cru counsel that was an email from -- purporting to

18   be from Ms. Hudson also with an attachment of what appeared

19   was -- appeared to be an authentic document from this court.

20   **Q.**    Is that email Exhibit 4 -- Government's Exhibit 4?

21   **A.**    I don't know that that is -- I don't see that one before

22   me, Counsel.

23       Oh, it was stuck underneath.  I apologize.  I have it now.

24       Yes.

25   **Q.**    And Page 2 of that document shows it was sent

1    January 27 -- that is the day of the arrest -- at 11:09 A.M.

2        What time did you see Ms. Hudson arrive at the site that

3    morning?

4    **A.**    The meeting was scheduled for 11:00, and we were a little

5    past that mark.  Within minutes.  I would say put that --

6    11:15ish, plus or minus a few minutes from this time stamp on

7    that.

8    **Q.**    Did -- are you aware of whether Ms. Hudson made any calls

9    before she arrived about sending this document?

10   **A.**    I'm not aware of any phone calls Ms. Hudson made.

11   **Q.**    Okay.  All right.  So the day of the arrest, whenever --

12   whenever Ms. Wortham was arrested, was she asked any questions?

13   **A.**    When --

14   **Q.**    Just tell me yes or no on that first.

15   **A.**    She was not asked any questions, no.

16   **Q.**    Did she make any statements?

17   **A.**    She made statements to the effect of, what is this all

18   about?  I don't understand.  What is the warrant for?  And

19   something along the lines of, this has already been taken care

20   of.

21   **Q.**    And at the time of that arrest, did you seize some phones

22   and computers?

23   **A.**    We did.

24   **Q.**    Okay.  And tell us about what you seized.

25   **A.**    We took a phone from Ms. Wortham, a phone that was on her

1    person.  And Ms. Hudson had two phones on her person.

2        And her vehicle search incident to arrest, we recovered a

3    laptop, a tablet, a passport, and various documents.

4    **Q.**    Okay.

5    **A.**    Various bank documents.

6    **Q.**    To be clear, has Secret Service had a chance yet to do any

7    sort of search of those items?

8    **A.**    The timeline has not allowed it.  So there has been no

9    search conducted on any of those items.

10   **Q.**    Two more topics.  One, Yahoo.com.  Have you had an

11   opportunity to determine whether Yahoo.com has any email

12   servers in Georgia?

13   **A.**    The law enforcement liaison for Yahoo stated Yahoo never

14   has nor do they currently have any servers in the State of

15   Georgia.

16   **Q.**    And then last topic, back on Exhibit 4, which was the

17   Ms. Hudson email -- well, let's -- I guess two more topics,

18   really.

19       So Exhibit 1 -- let's just do Exhibit 2.  So Exhibit 2 --

20   do you see Exhibit 2 in front of you?

21   **A.**    I do.

22   **Q.**    So Exhibit 2 is the document that purports to be signed by

23   Judge Batten with the attachment from the prosecutor.

24       Did you have an opportunity to speak with the Clerk of the

25   Court, Kevin Weimer, about Exhibit 2?

1    **A.**    I did.

2    **Q.**    And what did he tell you about its authenticity?

3    **A.**    Mr. Weimer explained that Exhibit 2 -- the face sheet

4    would be an authentic document.  And he made us aware of an

5    occurrence where Ms. Wortham had come into the court and

6    requested copies of a receipt of forfeiture, which is what this

7    form before it was altered was.

8        And then what has been doctored or what has been changed

9    about this form is basically Line 2 basically after the --

10   certified that the attached documents from that point on where

11   it says notice of nolle prosequi and dismissal of defendant

12   Kayricka Wortham -- that's been doctored.  It was originally

13   something to the effect of a receipt of -- what is the word I'm

14   looking for?

15   **Q.**    Forfeiture?

16   **A.**    Forfeiture.  I apologize.

17   **Q.**    Okay.  And did you speak to the deputy clerk, Ms. Creech,

18   that also signed this?

19   **A.**    We did.  Ms. Creech came in and verified that she

20   remembered the interaction with Ms. Wortham and showed us an

21   authentic receipt that they keep for this interaction.  She

22   actually has a -- had a post-it note that was placed on it that

23   was provided to her by Ms. Wortham -- I believe she refers to

24   herself as Ms. Dupree in it -- with a phone number and an email

25   address.

1    **Q.**    Okay.  And let me show you what I have marked as

2    Government's Exhibit 5.

3         Do you recognize Government's Exhibit 5?

4    **A.**    Yes.

5    **Q.**    What is Exhibit 5?

6    **A.**    This is the receipt that the clerk's office would keep for

7    a request of documentation.  In this case, it was a copy or

8    receipt for three exemplified copies of the forfeiture --

9    receipt of forfeiture requested by Ms. Kayricka Dupree.

10   **Q.**    And that version you have has the original post-it -- the

11   yellow post-it there on it that says Kayricka Dupree, has a

12   phone number, has a case number.  It says three exemplified

13   copies of order of forfeiture of property and has an iCloud

14   email account?

15   **A.**    That's correct.

16   **Q.**    What did the deputy clerk tell you, if anything, about who

17   wrote that information on the post-it note?

18   **A.**    She said Ms. Dupree provided the post-it note to her.

19   **Q.**    Okay.  And Page 2 of Exhibit 2, which is the notice of

20   nolle prosequi and dismissal that has the Norman Barnett

21   signature on it, what, if anything, did the clerk tell you

22   about this document?

23   **A.**    He said that this document does not -- would not exist.

24   They don't -- a nolle prosequi dismissal is not a document that

25   this court produces.  However, the stamp in the upper right

1  corner has the characteristics of an authentic stamp that would

2  have been taken off of an authentic document.

3       And in this case, it appeared that it came from, I

4  believe, Ms. Wortham's information and the date was changed.

5  **Q.**   Okay.  And that B. Creech there, is that the deputy clerk

6  you spoke to that is written into the stamp?

7  **A.**   Correct.

8  **Q.**   All right.  Then the same thing on Exhibit 4, the last

9  page, same sorts of questions.

10      Was the Clerk of the Court able to tell you anything about

11  Judge Batten's signature that appears on the last page of

12  Exhibit 4?

13  **A.**   He was.  He stated that in this case this appeared to be a

14  copy of Judge Batten's electronic signature that likely came

15  from a legitimate court document.

16  **Q.**   And what about the stamp that appears at the top, the

17  December 29, 2022, stamp?

18  **A.**   The clerk identified that this stamp was consistent with

19  doc one of Ms. Wortham's information.  And that conclusion was

20  based on the wet signature of the initials of the judge's clerk

21  and basically the second initial being a Z.  The swoop of that

22  Z intersects clerk in an exact manner that it appeared on doc

23  one of Ms. Wortham's information.

24  **Q.**   Okay.  So doc one was filed in September 2022.  Did he

25  tell you anything about the date on the stamp?

**A.**   It also appears that the date was altered as well.

          MR. MCCLAIN:  Okay.  That's all I have, Your Honor.

          THE COURT:  Did you intend to move Government 5 into evidence or not?

          MR. MCCLAIN:  Oh, I don't believe so.  The Government moves Exhibit 5 into evidence.

          MR. LOTITO:  No objection.

          THE COURT:  Any objection?

          MR. FINLAYSON:  No objection.

          THE COURT:  It is admitted.

          Mr. Lotito, are you going to go first this time?

          MR. LOTITO:  Okay.

                    CROSS-EXAMINATION

BY MR. LOTITO:

**Q.**   Good afternoon, Agent Oltman.

**A.**   Good afternoon.

**Q.**   If I could direct your attention to Exhibit 5.  So this receipt that is dated December 27 of '22 -- it is your information that Ms. Wortham had gone to the clerk's office and obtained a copy of the preliminary order of forfeiture --

**A.**   That is my understanding.

**Q.**   -- in this case?

**A.**   Yes.

**Q.**   And from your familiarity with the case -- we met early on in the case.  I withdrew sometime, I think, in November.  I

1  can't remember the exact time.  Maybe early December or maybe

2  mid-December actually.  It was mid-December.  I do remember.

3       And so at this time, Ms. Wortham was proceeding pro se; is

4  that right?

5  **A.**   Yes.

6  **Q.**   Would you -- I take it you would have no knowledge that

7  for whatever reason she filed a copy of this preliminary order

8  of forfeiture in the Fulton County Superior Court sometime

9  after obtaining it from the clerk's office?  Do you have any

10  knowledge of that?

11  **A.**   I do not.

12  **Q.**   But that was a legitimate document and you have no basis

13  for knowing what need she had for that particular document, I

14  take it?

15  **A.**   I do not know.

16  **Q.**   Okay.  If you could look at the -- in the bottom left-hand

17  corner, that is, I guess, a post-it note that was left in the

18  clerk's office.

19       Okay.  And, again, this is -- this is December of last

20  year.  This problem that caused the reason we're here -- it is

21  your understanding from the testimony you heard and your

22  knowledge of this and the motion filed -- it didn't arise until

23  January 23rd when Ms. Scott came across the Amazon newspaper

24  article that led to this inquiry?

25  **A.**   Correct.

1    Q.    All right.  So I mean, there is no way in December that

2    Ms. Wortham could somehow think, yeah, I'm going to need some

3    court document.  I better go get a court document so that I can

4    fabricate something a month later?  I mean, there is no basis

5    for thinking that; right?

6    A.    Correct.

7    Q.    Okay.  If you could compare the -- the email address at

8    the bottom kayrickadupree@icloud.com with the email on the

9    second page of Exhibit 1.

10   A.    It is redacted.  It just says k.dupree@, and the rest is

11   redacted.

12   Q.    Right.  But it doesn't say Kayricka Dupree and then have a

13   redaction?  It is k.dupree?  It is not the same email address;

14   right?

15   A.    Correct.

16   Q.    Okay.  And do you know from your experience in reviewing

17   items in this case that the kayrickadupree@icloud.com is the

18   email that Ms. Dupree -- Ms. Wortham uses?

19   A.    We've come across more than one.  I don't have them all.

20   There's more -- I know there's more than one in the findings of

21   this investigation.

22   Q.    But these emails -- those emails don't match?

23   A.    Correct.

24   Q.    And they are within several weeks of one another?

25   A.    Correct.

68

```
 1                 MR. LOTITO:  That's all I have.
 2                 THE COURT:  Mr. Finlayson?
 3                 MR. FINLAYSON:  Very brief.
 4                           CROSS-EXAMINATION
 5    BY MR. FINLAYSON:
 6    Q.   So you arrested Ms. Hudson on the 27th?
 7    A.   On Friday morning.
 8    Q.   Friday morning.
 9         And she didn't make any statements to you when you
10    arrested her?
11    A.   She did not.
12    Q.   Okay.  Did she fight with you or flee or cause problems?
13    A.   She did not.
14    Q.   You have met with her several times in the past, haven't
15    you?
16    A.   Just once before when you were present.
17    Q.   Okay.  And she -- that was when we turned over a vehicle?
18    A.   Correct.
19    Q.   And that was at her house?
20    A.   Correct.
21    Q.   Here in the Northern District of Georgia?
22    A.   I'm sorry.  I didn't hear you.  What?
23    Q.   Here in the Northern District.
24    A.   Correct.
25    Q.   Yeah.  So you never had any problem locating her or her
```

1    fleeing from you in any way?

2    **A.**    No.

3    **Q.**    Okay.  She has turned over a substantial number of assets

4    to you, hasn't she, or to your agency?

5    **A.**    Correct.

6    **Q.**    Regarding this Government's 4, which purports to be the --

7    it looks like the fake motion to dismiss on behalf of Brittany

8    Hudson -- this document?

9    **A.**    Yes.

10   **Q.**    You don't know who prepared this, do you?

11   **A.**    I do not.

12   **Q.**    And you haven't -- do you think -- they think it is from

13   an electronic signature from Judge Batten?

14   **A.**    The Clerk of the Court said that that signature is

15   consistent with the electronic signature of Judge Batten, yes.

16   **Q.**    And would you know that Ms. Hudson doesn't have any

17   documents in her case signed by Judge Batten?  Do you know

18   that?

19   **A.**    I don't know that.

20   **Q.**    And the inverse of that:  You don't know of any document

21   signed by Judge Batten in Ms. Hudson's case, do you?

22   **A.**    I do not.

23            MR. FINLAYSON:  That's all my questions, Judge.

24            THE COURT:  Any redirect?

25            MR. LOTITO:  May I also just follow up?  I should

1    have asked this too.

2                          RECROSS-EXAMINATION

3    BY MR. LOTITO:

4    **Q.**    Agent Oltman, the same thing with respect to Ms. Wortham.

5         Did she make any statements at the time that you arrested

6    her?

7    **A.**    The statements that I shared with AUSA McClain.  Just,

8    what is this about?  What does the warrant say?  There has been

9    a mistake.  This has all been taken care of.

10        To the best of my knowledge, it was things of that nature.

11   **Q.**    And she didn't resist or anything?  She --

12   **A.**    No.

13   **Q.**    -- went with you into custody?

14        And you have also been present when she's been debriefed

15   for many hours and provided information relating to the Amazon

16   case?

17   **A.**    I wasn't the case agent during the proffer.  Again, my

18   only interaction was with you in the driveway there at the

19   location in Smyrna.

20   **Q.**    Where the cars were surrendered?

21   **A.**    Correct.

22   **Q.**    And you are also aware that she turned over, I guess, the

23   bank accounts that in her name were seized and she cooperated

24   in the process of the letting them be part of the

25   preliminary -- preliminary order of forfeiture; right?

```
 1    A.    Correct.

 2              MR. LOTITO:  Thank you.

 3              THE COURT:  Any redirect, Mr. McClain?

 4              MR. MCCLAIN:  No, Your Honor.

 5              THE COURT:  Agent Oltman, you may step down.

 6              Any other evidence you want to present, Mr. McClain?

 7              MR. MCCLAIN:  We do not, Your Honor.

 8              THE COURT:  All right.  Mr. Finlayson, do you have

 9    any evidence to present on behalf of Ms. Hudson?

10              MR. FINLAYSON:  I do, Your Honor.  I have a couple of

11    things.

12              THE COURT:  All right.

13              MR. FINLAYSON:  Your Honor, first of all, I have a

14    letter I have given to Government counsel, Defendant's Exhibit

15    -- Defendant BH1 -- I think we have already got 3 in -- which

16    is a letter from my client's therapist, Ms. Lissa -- Lissa

17    actually -- Tchernis.  So I will hand it to the clerk if I may.

18              THE COURT:  Any objection to the Court's

19    consideration of it, Mr. McClain?

20              MR. MCCLAIN:  I don't, Your Honor.

21              I would -- if it is proper, I would like to inquire

22    if counsel is proffering that he has spoken to this person.

23              MR. FINLAYSON:  Oh, I have, yes.  I have extensively,

24    yeah.

25              MR. MCCLAIN:  Okay.  I have no objection, Your Honor.
```

1          THE COURT:  All right.  It is admitted then.

2          MR. FINLAYSON:  And I guess -- and I'm not sure if

3   we're covering this altogether.  I have a witness as well, Your

4   Honor.

5          THE COURT:  Okay.

6          MR. FINLAYSON:  So I don't know whether it would be

7   better to go ahead and take the witness or -- I want to read

8   this to the Court eventually, or the Court can read it.

9          THE COURT:  Yeah, I can read it.  You can call your

10  witness.

11         MR. FINLAYSON:  Your Honor, I have another letter.

12  It is somebody else I have spoken to.  It is dated -- I think I

13  sent this to you ages ago.  It goes back to October.

14         But it is sort of a general character reference as

15  well that we have used in our submissions to the ATL court.

16         So I would put that in as Defendant -- Defendant BH2.

17         MR. MCCLAIN:  No objection.

18         THE COURT:  It is admitted.

19         Mr. Finlayson, is your evidence going to the issue of

20  probable cause --

21         MR. FINLAYSON:  No, Your Honor.

22         THE COURT:  -- or just --

23         MR. FINLAYSON:  This is really going to -- it is

24  going to what we do next.

25         THE COURT:  Okay.

```
 1              MR. FINLAYSON:  Maybe that is why I realize I may be
 2      getting ahead of --
 3              THE COURT:  Yeah.
 4              Mr. Lotito, are you going to have any evidence to
 5      present on the issue of probable cause?
 6              MR. LOTITO:  I haven't thought about putting in, you
 7      know, evidence.  Ms. Wortham has also been seeing a therapist.
 8      I have communicated with him.
 9              I had her evaluated by a -- a forensic psychologist.
10      And I submitted that evaluation and a letter from her therapist
11      as part of the ATL court application.
12              I could -- I would like to be able to just state in
13      my place some of the contents of that at the appropriate time
14      in this.  I can provide the Court a copy.
15              It will require a bit of calling my secretary and
16      having her email me a copy or something.  I never have provided
17      that to Mr. McClain.  I have no objection to doing that either.
18              But would that be appropriate if I could do that?
19              THE COURT:  Yes, you can make those arrangements.
20              MR. LOTITO:  Thank you.
21              MR. FINLAYSON:  Your Honor, I guess -- I don't know
22      how the Court's preference in terms of procedurally if we want
23      to have argument about probable cause or -- and then do matters
24      what next or how the Court wishes to proceed.
25              But I do realize we're -- I may have commingled
```

1    these.

2            THE COURT:  Yeah.  If you want to go ahead and

3    present your evidence from your witness.  If you have got a

4    witness you want me to hear from --

5            MR. FINLAYSON:  I do, yes.

6            THE COURT:  -- we'll go ahead and hear from them and

7    get that complete.

8            MR. FINLAYSON:  Your Honor, Kandice Williamson.

9            THE COURT:  Come forward to the witness stand.  If

10   you'll just remain standing and raise your hand and take the

11   oath, please.

12                   **(Witness sworn)**

13           COURTROOM DEPUTY CLERK:  Please be seated.  And state

14   and spell your name for the record.

15           THE WITNESS:  My name is Kandice Robinson.  K-A --

16   I'm sorry.  Williamson.  Kandice, K-A-N-D-I-C-E.  Last name

17   Williamson, W-I-L-L-I-A-M-S-O-N.

18       Whereupon,

19                       KANDICE WILLIAMSON,

20       after having been first duly sworn, testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. FINLAYSON:

23   **Q.**   And, Ms. Williamson, where do you live?  In what city and

24   state do you live in?

25   **A.**   Gainesville, Florida.

1   **Q.**   And what do you do there in Gainesville, Florida?

2   **A.**   I am a physical education teacher at a K through eight

3   private school, and I am an after-school coordinator for the

4   Alachua County School Board.

5   **Q.**   And that is there in Gainesville?

6   **A.**   Yes.

7   **Q.**   You know my client, Ms. Hudson?

8   **A.**   Yes.

9   **Q.**   And how do you know Ms. Hudson?

10  **A.**   She's my younger sister.

11  **Q.**   Did you, in fact, help raise her at times?

12  **A.**   Yes.

13  **Q.**   Do you understand why we are here today?

14  **A.**   I do.

15  **Q.**   The million dollar questions to you are:  If Judge

16  Vineyard were to give your sister a bond at this point, what

17  are your thoughts on whether or not she is going to flee or

18  take off or not deal with the responsibilities in the case?

19  **A.**   I have no doubt in my mind that she will follow whatever

20  the Court sets forth.  I don't -- I mean, she and I have a

21  great relationship probably out of all of my siblings.

22       And I know she knows that the fact that I am even here

23  speaks a lot about how I feel about her character.  Because if

24  I felt like she were a flight risk and she would not do what is

25  set forth, then I would not be here today.

1   **Q.**   Second question:  Similar but a little different, what

2   about an order to her that she not engage in any financial

3   transactions at whatever number the Judge were to put there,

4   say $500?  She will not engage in a financial -- any financial

5   transaction over $500 without approval of a probation officer

6   or the Court.  Do you think she would comply with an order like

7   that?

8   **A.**   I think she would comply with an order like that.

9   **Q.**   And how can you say that?

10  **A.**   Again, because when someone like me comes in to pretty

11  much vouch for you, I mean, I don't just do that for anybody.

12  And I think, you know, she's kind of realized like, you know,

13  hey, I have made some mistakes, and I have a chance to rectify

14  this.

15      So I think if the Court says you cannot make a transaction

16  over $200 without consulting somebody I think it would -- I

17  don't think she would, you know, go outside of that.

18  **Q.**   Okay.  Do you know -- how is her mental state?

19  **A.**   She's struggling honestly.  Like she's struggling.  And I

20  think it is a just culmination of things.  But I think it is

21  something, you know -- with the correct support, you know, of

22  myself, other siblings, other family members, friends -- I

23  think it is something that we can help, you know, her cope with

24  and manage and kind of, you know, get some stability in that

25  area.

1    **Q.**    Do you think she's depressed?

2    **A.**    Yes.

3    **Q.**    Will you do everything you can to help support her?

4    **A.**    I -- I always have every day of her life.

5    **Q.**    We're in a different situation now.  I mean, this is --

6    this is very -- very tight regulation.

7        Can you help stay on top of that --

8    **A.**    Yes.

9    **Q.**    -- tight regulation?

10    **A.**    Yes.  And, again, if I had any inkling of doubt that she

11    would not follow what the Court would say, I would not be here.

12            MR. FINLAYSON:  Nothing further, Judge.

13            THE COURT:  Any questions, Mr. McClain?

14            MR. MCCLAIN:  Just a few, Your Honor.

15                        CROSS-EXAMINATION

16    BY MR. MCCLAIN:

17    **Q.**    You said you live in Florida?

18    **A.**    Yes.

19    **Q.**    How often do you see your sister?

20    **A.**    Ironically enough, we see each other quite frequently.

21    Like, she's recently been to Florida a few times.  I have

22    driven up here.  Like, you know, we FaceTime.  We, you know --

23    you know, we have always been in communication with each other.

24    **Q.**    Can you give me an estimate of how much you see her in

25    person?

1    **A.**    Probably a few times a year.

2    **Q.**    All right.  Mr. Finlayson asked you some questions about

3    are you confident about your sister and how she would perform

4    on bond.

5        Are you aware of the charges in this case?

6    **A.**    I am.

7    **Q.**    And you understand that she's been charged with stealing

8    millions of dollars from Amazon?

9    **A.**    Yes.

10   **Q.**    By submitting fake invoices for fake vendors?

11   **A.**    Yes.

12   **Q.**    While she was driving and owning an Amazon truck business?

13   **A.**    Yes.

14   **Q.**    Were you aware that she was doing that last year?

15   **A.**    I was not privy to any of that.

16   **Q.**    Did she ever tell you she was doing that?

17   **A.**    No.

18       At some point, I guess, after the charges were filed --

19   **Q.**    Right.

20   **A.**    -- she kind of said like, here -- you know, hey, here is

21   what is going on.

22   **Q.**    While she was doing that, did she tell you she was doing

23   that?

24   **A.**    No.

25   **Q.**    Were you surprised to learn that she had been doing that?

1    **A.**    I think anybody would be surprised, you know.

2    **Q.**    All right.  Same question that -- you sat in court today

3    or not?

4    **A.**    I'm sorry?

5    **Q.**    Did you watch the proceedings today?

6    **A.**    Yes.

7    **Q.**    Okay.  And you heard evidence that your sister submitted

8    fake bank documents and a fake court document to Cru that she

9    had not committed any crimes?

10        Did you hear that evidence?

11   **A.**    Yes.

12   **Q.**    Were you aware that she had done that at the time -- when

13   it was occurring?

14   **A.**    No.

15   **Q.**    And were you surprised to hear that she had done that?

16   **A.**    Yes.

17            MR. MCCLAIN:  Okay.  That is all I have, Your Honor.

18            THE COURT:  Any redirect, Mr. Finlayson?

19            MR. FINLAYSON:  No, Your Honor.

20            THE COURT:  All right.  Ms. Williamson, you may step

21   down.

22            THE WITNESS:  Thank you.

23            THE COURT:  Thank you.

24            Any other evidence to present, Mr. Finlayson?

25            MR. FINLAYSON:  No, Your Honor.  Not other than the

1    letters that we've put in.

2          THE COURT:  Mr. Lotito, anything else other than what

3    you have mentioned earlier?

4          MR. LOTITO:  No, Your Honor.

5          THE COURT:  Do you need to take a recess to call your

6    office to see if they can transmit that evidence over here?  Is

7    that something -- can you accomplish that quickly, or are you

8    wanting to just supplement the record with it?

9          MR. LOTITO:  I can describe what it is, and then I

10   would supplement the record if the Court is comfortable with

11   that.

12         THE COURT:  Any objection to that, Mr. McClain?

13         MR. MCCLAIN:  I have no objection to him proceeding

14   by proffer on that matter.

15         THE COURT:  Okay.

16         MR. LOTITO:  Thank you, Steve.

17         THE COURT:  Mr. Finlayson, you want to start then

18   with your letters --

19         MR. FINLAYSON:  Yes.

20         THE COURT:  -- and any argument you want to make on

21   the Government's evidence with respect to probable cause?

22         MR. FINLAYSON:  Sure.

23         Your Honor, I understand why we are here, and I

24   understand the concern obviously of the Court and of the

25   parties or the parties being the Cru folks.

```
 1              And where we are -- where we are and where we have
 2   been is when Ms. Hudson came into this court and was given a
 3   bond on the Amazon matter, we put no conditions.  I mean, and
 4   that was -- I mean, it was great trust shown by the Government
 5   and great trust shown by us and the Court.  And there were zero
 6   conditions.
 7              THE COURT:  There were conditions.  She was not to
 8   violate a federal, state, or local law --
 9              MR. FINLAYSON:  Right.
10              THE COURT:  -- which is why we are here.
11              MR. FINLAYSON:  Right.  Right.  Good point.  Good
12   point.
13              But nothing -- no pretrial supervision.  No check-in
14   with the probation officer.  Don't turn in your check stubs or
15   show any -- no drug -- whatever.
16              And because it was -- it was an unusual case with
17   unusual defendants.  I submit and I am arguing to the Court
18   there are conditions we can put in place to alleviate fears
19   going forward.
20              And obviously I don't think anybody thinks Ms. Hudson
21   is going to be a risk of flight.  And obviously the reason
22   we're here are the allegations of a new financial crime.
23              I think if the Court imposes a condition that there
24   be no financial transactions -- and the Court can pick the
25   number.  I said $500.  But whatever it needs to be, no
```

1    financial transactions without approval of either pretrial

2    services or the Court -- I think we can -- we can comply with

3    that and I think we can meet that.

4           When we look -- I think the worst piece of this new

5    situation are these documents and the fact that documents of

6    the Court were fabricated.

7           Exactly who did that and how that happened is still,

8    I think, to be solved.  But we don't dispute they were made,

9    and we don't dispute they were presented to Cru.

10          Ms. Hudson is in a slightly different situation in

11   that -- like, I don't know what is going to happen going

12   forward with the case, if the Government is going to charge a

13   separate crime or not.

14          The prosecutor and I have had discussions about what

15   would that crime look like or what could it be.  And it is --

16   we are a little bit in a theoretical stage right now.  And

17   maybe it won't be anything.

18          But it is, you know, for better -- for better and

19   better, not better or worse -- but for better, Ms. Hudson

20   didn't have any kind of agreement with the folks at Cru.

21   She -- there was no contract.  There was no -- there was no --

22   you know, there was no -- nothing material was -- there was no

23   representation that was material to a contract or decision.  It

24   was preliminary-preliminary.

25          And so we are in a little better spot there in that

1    this isn't like there was a loan application that was submitted

2    where everything was sworn to be true and correct and

3    furthermore give me $600,000 and let me steal money from you.

4            And that is sort of -- that is what is very clear

5    from this deal with the Cru franchises.  Nobody was trying to

6    steal anything from anybody in that situation.  They were

7    paying for Ms. Hudson or -- Ms. Wortham particularly was paying

8    them a whole bunch of money.  They got the money, which they

9    apparently want to keep.  But that is a different story.

10           But there was no intent here to get money improperly

11   and steal money and defraud it and hurt Cru in any way.  And I

12   think the emails that the woman spoke about today and the

13   Government put into evidence, like I'm really sorry --

14   Ms. Hudson, I'm really sorry, I did not want to hurt your

15   brand.  And I think that is all sincere.

16           There is no notion of, you know, that being like a

17   self-serving statement to try to -- you know, they weren't

18   trying to hurt the brand.  They were trying to build the brand,

19   and they were trying -- they were spending money, time, and

20   tons of elbow grease to try to make something for the future

21   and to have a business to make income to support the children

22   and to pay restitution.  Because there is going to -- there is

23   a huge amount of restitution that has already come back in or a

24   huge amount of assets that have come back in towards the Amazon

25   fraud.

84

1          I think by the end of the day, the Government is

2     going to probably get about 5 million back on that 9, maybe

3     4-1/2.

4          But the -- you know, they are still going to have a

5     whole bunch ordered.  And they are in a spot where, how do we

6     make a living going forward?  And that -- so the intent here --

7     the means, not good.  The intent was good.

8          And I don't think anybody was trying to hurt anybody.

9     There was no desire to hurt the brand.  No desire to hurt Cru.

10         I think the witness was very candid.  She was like,

11    you know, it was Ms. Hudson, and it wasn't like anything had

12    really -- there was no deal.  There was no signature.  It was

13    all too early for that sort of thing.  So I'm sorry I'm sort of

14    commingling again my arguments and my issue.

15         But what I'm asking the Court to do is to put her on

16    house arrest, GPS monitor.  If you want to lock her down 24/7,

17    we'll take it.  Because at least that could allow some

18    visitation with her son -- four-year-old son.  Supervision by

19    pretrial services.

20         Absolutely -- and I think if you read the letter from

21    the therapist, absolutely she needs constant weekly therapy

22    with the therapist.  And I think the therapist says some things

23    like, you know, including, if needed, prescription for

24    anti-depressants; you know, follow-up visits for medication

25    management; evaluation for higher level of care, if needed;

1    including presentation to a hospital emergency department, if

2    deemed necessary.

3            I have spoken to the therapist several times, and she

4    is very supportive of Ms. Hudson.  She has been very impressed

5    with their working relationship.  Ms. Hudson has taken her

6    therapy very serious.  And, in fact, ironically, as it felt

7    like this Cru Lounge was going to open and Ms. Hudson had a

8    job, if you will, and was day-to-day engaged in getting this

9    place off the ground, believe it or not, her mental health was

10   much better.  And that is sort of the way life is.  When you

11   are engaged in something meaningful and constructive, your

12   mental health gets -- it gets a lot better.  And the opposite

13   is also true.

14           But the therapist is very adamant that -- and her

15   question to me was, who do I call if this doesn't go right?  In

16   other words, if she doesn't show up for her therapy and she is

17   not, you know, following my directions -- I said, you can --

18   I'm going to give you the name of the pretrial services

19   officer.  You can call them first.  You call me second.  Or you

20   can call me first or call -- but, you know, that is who -- you

21   know, there is a hook right there.

22           There is a person whose job it is.  And if Ms. Hudson

23   is not complying and participating in the therapy as you feel

24   is appropriate, that is the number to call.  And we -- we make

25   that -- we put all this in writing and make sure that, you

1    know, the right thing happens going forward.

2          And that is -- that is what I'm proposing, Your

3    Honor.  I think, you know, clearly being down at Robert A.

4    Deyton for the last few days is not -- you know, it is -- the

5    first time is the worst.  And it has not been good.

6          She hasn't seen mental health down there yet, by the

7    way.  But I don't think you are going to have any trouble out

8    of Ms. Hudson going forward.  And I think those conditions --

9    you know, we -- I think in a lot of like, I guess, rehab

10   programs and things, you have gradations and you have steps and

11   you have -- if there is, you know, a violation and you go

12   back -- and I'm asking the Court to view this as, okay, we

13   tried it -- we were wide open before with no conditions.  And

14   now I'm asking the Court -- well, okay, mistakes were made.

15   Let's go to, you know, a moderate level of the -- or the next

16   level of conditions, which, you know, they can be as tight as

17   they want just as long as she can be home.  And I think that

18   would be appropriate.

19         There is no dollar loss to Cru.  There's some

20   cases -- we've looked at some cases -- Mr. McClain provided a

21   case where a lawyer was convicted of this sort of thing.  And

22   he got five years' probation for using fraudulent documents for

23   the court.  And you look at the guidelines.  It is like six,

24   plus two, minus two for acceptance.

25         You know, it is the principle of the matter.  I get

1   it.  And it is principle.  But the actual time on the new

2   charges from the case, if they were to come, it is more the

3   principle than the actual loss or harm to another party or

4   society here.

5           So that is what I'm asking for, Your Honor.  Thank

6   you for listening.

7           THE COURT:  Thank you, Mr. Finlayson.

8           Mr. Lotito?

9           MR. LOTITO:  Your Honor, I knew this was not going to

10  be an easy case to come back into.  I had a good relationship

11  and have a good relationship with Kayricka, and I came back

12  into the case because I care a lot about her, and I think she's

13  an incredibly gifted person who has obviously made some

14  mistakes.

15          She's -- I want to just give you some background, and

16  I think it is necessary to know this about the case to

17  understand, you know, how we got here.  She's 31, has no prior

18  criminal history.

19          The conduct at Amazon covered roughly about a

20  six-month period.  She had progressed at Amazon and was a site

21  manager.  It started in January of 2022; ended by early July of

22  2022.  She actually left Amazon in March of 2022.

23          She did assist some other people to continue the

24  conduct.  She had -- I think she had involvement after that.

25  But it went on because other people were brought in to kind of

1    take her place.

2            It was a considerable amount of money, over

3    $9 million, that was taken.  But there was a substantial amount

4    of money that is being returned that has been forfeited and

5    will be returned to Amazon.

6            Leigh said he thought it might be 5 million.  I think

7    it is between 5 and 6 million when you add up the value of the

8    cars; when the house is sold, which has appreciated in value;

9    and the bank accounts that have been seized.

10           The motive for her doing this is about as atypical as

11   you can possibly think of.  She truly believed she was doing

12   something based on a perceived need to keep Brittany, who they

13   were involved at the time -- they became involved -- from

14   committing suicide.  Her conduct was an emotional reaction,

15   completely illogical.

16           THE COURT:  You are speaking of the fraud conduct or

17   the conduct that we are here about today?

18           MR. LOTITO:  Yes, the fraud conduct.

19           THE COURT:  The fraud conduct.  Okay.

20           MR. LOTITO:  And a lot of it -- Brittany was going

21   through a contentious divorce where her soon-to-be ex-wife was

22   taking a lot of possessions and was a constant suicide threat.

23           And this was something that based on an evaluation

24   from Dr. Zito that I had Kayricka undergo she was susceptible

25   to this kind of issue.  She -- her father left the family when

1    she was about five years old.  Her mother has been married
2    about three times.  Some of those males have been emotionally
3    and physically abusive to her mother, her brothers, and to some
4    extent to -- at least emotionally to Kayricka, where she had to
5    learn to basically take care of herself from -- really from a
6    very early age.
7            She gave birth to her child, Destiny, who is 13 now,
8    when she was 18 years old.  Yet she still worked in high
9    school.  She was the salutatorian of her high school class in
10   Delaware.  She came to Georgia State and got degrees in finance
11   and human resource management where she was summa cum laude.
12           She was working during college while she was
13   accomplishing these things in retail marketing as a staffing
14   and training coordinator.  And then she got leadership
15   positions with Robert Bosch, a company that is similar to
16   Amazon but smaller than Amazon and back to Bosch.  And she was,
17   you know, obviously doing well.
18           She engaged in this conduct for the reasons I said.
19   And at the debriefing, what I understand from -- and, you know,
20   from my -- I understand from Brittany's debriefing she
21   acknowledged that what Kayricka was doing was she saved me
22   basically through this very difficult time.
23           She was the first person to come in in this case.
24   She began cooperating.  Her cooperation was thorough.  I
25   believe one or more people would be charged based on her -- on

1    her cooperation.  And a lot of the money was repaid.

2         Somehow she got influenced by -- it is not -- she

3    steadfastly says it is not like a sovereign citizen movement.

4    But it is something relating to equity.  And in connection with

5    that, she wanted to represent herself because she thought --

6    she was persuaded somehow that this was her best chance to not

7    go to jail and that she would be there to take care of Destiny.

8         I did everything I could to convince her both that

9    that was not a good approach, but I was unable to do that, and

10   that is when I withdrew.  The document that she got, the

11   preliminary order of forfeiture, again, because of this

12   influence that she had relating to these filings, she filed a

13   copy of that document in Fulton County Superior Court is my

14   understanding.  I haven't actually retrieved that document.

15   But I believe it has been filed.  And I could obtain a copy of

16   that.

17        That was her reason for going there and getting that

18   document.  Not to have some document that she could fabricate

19   later.

20        Her motive for approaching Cru -- well, she liked

21   these kinds of lounges.  And that was one of the things that

22   she did for release when she was working many hours a week for

23   these companies like Amazon and Bosch.

24        So she wound up dealing with Mr. McKinley, who owned

25   this location in Midtown.  It was very successful.  I was still

1    involved when she -- when I asked her, well, have you looked at

2    financials?  And the financials she said were 1.2 million a

3    year, about 600,000 of which was profit.  So that was her

4    motive in doing this.

5         And the plan was this was going to generate money to

6    take care of Destiny if she were incarcerated, which obviously

7    there was, you know, a reasonable chance that that was going to

8    happen eventually despite her cooperation, and also pay money

9    toward restitution, in addition to the substantial money that

10   she's helped pay.  And of all the money that was generated from

11   Amazon, a lot of expensive cars were bought, really mainly

12   because that is what Brittany wanted.  Almost none of that

13   money was spent by Kayricka on herself.  It is very -- it is a

14   very weird case in that respect.

15        So that was her plan.  Then she had already paid

16   $260,000 to Cru Lounge with respect to this location in

17   Midtown.  And they were going to operate -- open New Year's

18   Eve.  There was some sort of a leak or something.  More

19   renovations and repairs had to be done.  So that was delayed

20   for a few weeks.  But they were virtually ready to open this

21   location when this issue about the Amazon case came up.

22        So there was a threat there to basically

23   disenfranchise her, to keep her from pursuing something that

24   she thought was kind of a dream and something that she thought

25   would provide for her daughter and also help with restitution.

1        And so her plans and her hard work all of a sudden

2    were going to, you know, evaporate.  And the Zoom call was

3    planned.  And the representations made there obviously were not

4    accurate.  But it was not to defraud or get money from Cru.  It

5    was to try -- it was a desperate attempt to try to preserve and

6    keep her investment and franchise open.

7        Obviously she was uncounseled at the time.  I wish I

8    had been involved to say there was better ways to do that.  I

9    wasn't there.  I didn't know about that.  And the approach that

10   she took was clearly misguided.

11       But it wasn't some sort of, you know, scheme to take

12   money from Cru Lounge.  She was trying to make a viable

13   business with them with her franchise in that location, which

14   was the flagship for those particular locations.

15       Leigh mentioned this, the *London* case that Steve sent

16   to us this morning, which was a lawyer who literally fabricated

17   documents in a case he was involved in.  And he claimed that

18   the client -- his clients owed $27,000, when, in fact, the

19   judge had ruled favorably for him in that case.  I think it was

20   Judge Elliott who he appeared before in the Middle District in

21   Columbus.

22       You know, Kayricka is not a lawyer.  She's a

23   31-year-old single mother.  You know, we all -- most of us in

24   this room at counsel table -- you know, we all won the lottery

25   in terms of being born a white male in Atlanta.  Kayricka has

1    had to struggle from a very difficult childhood environment to

2    accomplish what she has.  And she has done some foolish and

3    immature things, and sometimes it is easy to forget that

4    she's -- she's 31 years old.  She's the age of my son.  And

5    she's made some mistakes.

6           She also has incredible talent where she has

7    accomplished really good things.  In the Amazon case, she was

8    trying to help someone else.  In this instance, she was trying

9    to preserve her investment.  I concede there were better ways

10   to do both of those things.  But her motives were not typical

11   of someone that is, you know, a hardened criminal.  She is not.

12          She's really a good person.  She cares for her

13   daughter.  She cares for other people.  She has always been the

14   lifeline that everyone else turned to for help in her family

15   and even friends.  And because people abandoned her, she felt

16   like she couldn't abandon them.  And that's why she has engaged

17   in the things that she has.

18          I am going to plead also the same types of things

19   that Leigh suggested I think would be sufficient -- a

20   combination of conditions that would be sufficient to guarantee

21   that she would not commit any new offenses.

22          She has -- we have talked about her withdrawing the

23   filings that have been made by her pro se and disavowing those.

24   And I'm hoping that we're going to be able to do that.  She can

25   be on home monitoring.  We -- she has a mother.  But her mother

1    has a husband that is a danger to Kayricka.  And that has been

2    something that has brought -- not to Kayricka but to Destiny,

3    her daughter.  And that is not a viable place for Destiny, the

4    13-year-old, to stay.

5         She's got a friend that has come down from South

6    Carolina that is staying at her apartment that is taking

7    Destiny to school.  Destiny is a gifted student.  I mean, she

8    is following in the good footsteps that Kayricka has walked.

9    And she needs time before there is a sentencing in this Amazon

10   case to work something out, to have a viable arrangement for

11   Destiny's care.

12        This was -- you know, judges often say, well, she

13   should have thought of that beforehand.  But someone that acts

14   impulsively when something is threatening their investment and

15   their plans, they do stuff that sometimes is stupid but it

16   wasn't to harm someone else.  It was just a desperate act to

17   try to preserve something that she had hoped would work.

18        So I'm asking that you, again, put her on some type

19   of home monitoring with rigid conditions.  She's not a flight

20   risk.  She knows that, you know, this is the first time I think

21   she's ever been in a facility like Lovejoy also.  I had to see

22   her there the other day.  And, you know, that's -- I don't

23   think it takes a lot of jail to get somebody to realize the

24   things that are important in life.

25        And she realizes that the person who is important in

1    life for her is her daughter Destiny.  And that is all we're

2    asking for is an opportunity.  And in some ways, you know,

3    maybe it is chutzpah to ask for that because she's done some

4    things that are not admirable.  But they haven't been done for

5    the motives that people often act with.

6          So I think that she will have a successful and good

7    future.  But I think she needs a little bit of help here before

8    her life might be interrupted through the Amazon case.  So I'm

9    asking you to reach down and do something for somebody that is

10    not a bad person that might be a little risky in some ways.

11    But I think it is a risk that will not come back to haunt us.

12    I think it is one that I hope you find a way to do it.

13          Thank you.

14          THE COURT:  Thank you, Mr. Lotito.

15          Mr. McClain?

16          MR. MCCLAIN:  Your Honor, I know you're familiar with

17    the law.  But to level set my presentation, I do want to get us

18    where the statute is, which is 18 U.S.C. 3148(b).  And the

19    standard that we're applying here today is that the Court shall

20    enter an order of revocation and detention if you find two

21    things:  One, probable cause that the person committed a crime

22    while on release; and -- either one of two things.  Either,

23    one, that based on 3142(g), there are no conditions that will

24    ensure the defendants don't flee or pose a danger to the

25    community; or you find that they are unlikely to abide by the

1    conditions of release.  So those are the two standards.  And

2    you shall enter an order if those two standards are met.

3          So on that first question -- well, one more piece of

4    the statute before we address the two factors.  If you find

5    probable cause that the defendants committed a crime while on

6    release, then there is a rebuttable presumption that there are

7    no conditions that will assure that they do not pose a danger

8    to community.

9          So if we hit that first mark of probable cause, they

10   committed a crime, now there is a presumption that that second

11   prong is met and they have to rebut the presumption with

12   evidence or with argument or with proffered evidence today.

13   And so we submit that that rebuttable presumption has been

14   triggered and that they haven't rebutted it.

15         So on that first prong, is there probable cause of a

16   crime, we submit that there is.  I've identified five crimes.

17   The two that we mentioned in the brief are wire fraud and

18   aggravated identity theft.

19         But we heard from the witness today at Cru, who had

20   personal knowledge of the interactions with the defendants.

21   She dealt with them personally.  She knows them.  She knows

22   their voice.  She heard them on a 35-minute Zoom call lie about

23   the status of this case.

24         They submitted -- Ms. Hudson submitted doctored bank

25   statements to Cru that inflated the statements by $300,000 in

1    one case, $200,000 in another case, all in an effort to

2    maintain, get a Cru franchise.

3          And so that meets the elements of wire fraud.  We

4    have misrepresentations -- multiple misrepresentations.  All

5    submitted by interstate wire.  We saw that the email account

6    that was used in this case Yahoo.com email account.  And you

7    heard the agent say that they don't have email servers in

8    Georgia.  So those emails generated interstate wires.

9          Misrepresentations were there.  There was a scheme to

10   defraud, and the scheme was to obtain something valuable, money

11   or property, the Cru franchise.  And so, you know, the fact

12   that they had put some money into the franchise doesn't mean

13   that the scheme is not to obtain money or property.

14         I'm thinking of -- if you lie to get a car, you might

15   put a down payment down.  But if you lie to get that car, you

16   could still have wire fraud just because you invested into the

17   car.  If you're lying to get the property, it is still wire

18   fraud.

19         And that is what has occurred here to get this

20   franchise, to get money from the franchise, to benefit from the

21   franchise.  Even in the arguments today from counsel, they say,

22   well, they were trying to get money so they could pay

23   restitution is the argument.  So the idea is to get money.

24         And the money doesn't have to come from Cru.  The law

25   in the Eleventh Circuit is convergence is not required.  The

1    lie doesn't have to go to the person that is paying the money.

2    It just has to be a scheme to get money.  And lies are used in

3    furtherance of such a scheme.

4         So that is what we have here.  They are trying to get

5    a valuable Cru franchise, trying to make money, doing it

6    through lies, doing it through a scheme to defraud.  So that

7    meets the elements of wire fraud.

8         Aggravated identity theft is also in play, is also

9    triggered because that statute says that if they use the means

10   of identification of a real person during and relation to the

11   wire fraud they have committed aggravated identity theft.

12        And here we have Kevin Weimer's name being used.

13   Means of identification includes a name.  Kevin Weimer's name

14   is being used.  A deputy clerk's name is being used, who is

15   real.  We heard that today from the agent.  Norman Barnett, the

16   AUSA's name, is being used, and Judge Batten's name is being

17   used.  So we actually have multiple prongs here of aggravated

18   identity theft where the name of real people is being used in

19   furtherance of a wire fraud scheme.

20        I actually didn't hear much from counsel in terms of

21   rebutting the probable cause.  What I heard really was, you

22   know, sort of there is good intentions behind this to earn

23   money to support the family and to pay back restitution.

24        I don't -- there is no evidence of that, that that

25   was the intention.  You know, the interest in this hookah bar

1    predated the crimes or at least predated them being arrested in

2    this case.

3              This was an interest, I think as Mr. Lotito said.

4    They had an interest in this bar.  Sure, they wanted to make

5    money.  Whether or not they wanted to pay back restitution, you

6    know, I think that is doubtful.  There was never any contact

7    with the U.S. Attorney's Office that we heard of to say, hey,

8    what we're going to do is we want -- they told us about the

9    hookah bar on proffer, to be fair -- to be candid with the

10   Court.

11             But in terms of what they were doing in January,

12   there is never any contact to say, hey, we want to pay back

13   restitution, and they are getting hinky because we've got this

14   conviction.  Could you guys come in and step in?  Because we're

15   really trying to do the right thing to pay back the victims.

16             I mean, this was all hidden.  You saw the email from

17   Ms. Wortham saying, you know, this is all hidden, nobody is

18   going to know about this.  It is all sealed.  I have to keep it

19   secret.  It has been -- they tried to get me to sign an NDA.

20             So, you know, whether or not this was an attempt to

21   pay back restitution, there is no evidence of that.  And I

22   think the evidence could go the other way on it.  In fact, we

23   have seized accounts from Ms. Wortham pretty recently since her

24   proffer where there is money that she still has that we have

25   seized since the proffer and since she's cooperating and since

1  she would have this incentive to pay back restitution.  So she

2  has kept on to money that has been seized instead of offering

3  it up for restitution.  And so there is probable cause of both

4  of those crimes.

5      Both counsel -- I had emailed them this morning.  The

6  case they are talking about is not wire fraud and aggravated

7  identity theft.  It is actually 18 U.S.C. 505.  So I don't know

8  if the Court is familiar with it.  I had never had any

9  experience with it.  I'll offer it up.  I had emailed this to

10  counsel.

11      And so there's actually a statute that is directly on

12  point for seals of courts and signatures of judges.  It says

13  whoever forges the signature of any judge or forges or

14  counterfeits the seal of any such court knowingly concurs in

15  using such forged or counterfeit signature or seal for the

16  purpose of authenticating any proceeding or document knowing

17  such signature or seal is false or counterfeit shall be fined

18  and not imprisoned more than five years or both.

19      And so, you know, this statute is actually directly

20  on point for the fraudulent seal and the judge's signature.  I

21  sent them the *U.S. v. London* case, which they referenced,

22  because that was a case where the defendant had copied the

23  judge's signature -- a photocopy, I believe.

24      And so what the defendant was arguing was, well, that

25  is not really a forgery, that is really the judge's signature,

1    we just copied it.  And what the Eleventh Circuit said is no,

2    that is forging.  The mere fact that you didn't put the pen to

3    paper and actually write it yourself -- you copied -- you

4    photocopied it from another document.  If you're using it in

5    this kind of way, that is a forgery.  That is illegal.  That is

6    Section 505.

7           So that is important in this case because Judge

8    Batten's signature on that first document is real -- that

9    exemplification document is real, as I understand, truly signed

10   by him.  It is altered to make it look like it attaches a

11   nol-pros instead of the order of forfeiture.  And so it is his

12   real signature.  But it is used in a way that violates

13   Section 505, in addition to the Ms. Hudson document where they

14   are cutting and pasting.  I guess his real signature as cut and

15   pasted is photocopied in a sense.  I think it is electronically

16   copied over from a PDF.

17          But what that *London* case says is that is exactly

18   what Section 505 contemplates.  So both defendants have

19   violated Section 505 as well.  So we have that third crime.

20          I don't think the Court needs to get there.  But

21   forgery, a state crime, 16-9-1, and also identity fraud,

22   16-9-121.  The forgery says with the intent to defraud

23   knowingly, make, alter, or possess any writing other than a

24   check in a fictitious name or in such manner that the writing

25   as made or altered purports to have been made by another person

1    at another time with different provisions or by authority of

2    one who did not have the authority and you utter or deliver

3    such writing -- that is Georgia forgery.

4            So that is -- that is an issue as well because we

5    have a writing that has been made or altered to purport to come

6    from another person, Judge Batten, the AUSA, Mr. Weimer.

7            And then finally identity fraud says -- it is a

8    simple statute.  It says, without authorization or consent use

9    or possess with intent to fraudulently use identifying

10   information concerning a person.  The statute defines

11   identifying information to include a name.  And so all you have

12   to do is use or possess with the intent to fraudulently use the

13   name concerning a person.  So, again, that happened here with

14   Judge Batten and the AUSA.

15           So by my count, that is five statutes, three federal

16   ones, including one that has a mandatory minimum of two years

17   in prison that we have probable cause that were committed.  And

18   the evidence is pretty clear from the Cru employee and from the

19   attached documents, the emails, and the fraudulent documents

20   and the Clerk of Court's explanation of how they were actually

21   created -- that the evidence is extremely strong that all five

22   of those were committed.  So there is probable cause of all

23   five of those offenses.

24           So that first prong of there being probable cause

25   that a person has committed a crime in our judgment we submit

1    has been met.  And so now the Court -- that sets up the

2    rebuttable presumption of prong two that 3142(g) applies.  And

3    we submit the defendants have not rebutted that presumption by

4    any evidence that they put on.

5            I would point out that the four factors of 3142(g) I

6    think support detention.  That first factor of nature and

7    circumstances of the offense here are extremely serious.  On

8    the bond revocation matter, again, we have probable cause of

9    five different crimes that were committed, including aggravated

10   identity theft, which carries a mandatory minimum of two years

11   in prison.

12           We have the 18 U.S.C. Section 505 using the Chief

13   Judge of this Court's signature, using a prosecutor's

14   signature, using the Clerk of Court's documents and seals to

15   commit crimes, which, you know, is an affront to the integrity

16   of the court and an affront to the integrity of judicial

17   proceedings and the orders being issued by this court and what

18   the U.S. Attorney's Office is doing in a case.

19           I think that is an extremely serious crime just in

20   its nature.  That is why Congress passed Section 505 is because

21   to protect the integrity of the judicial process and the court.

22           We also have state crimes that were committed.  And

23   Your Honor made that a condition of the bond, including state

24   and local crimes, and so those were also violated in this case.

25           I think it was just brazen.  We have altering bank

1    documents to add 2-0 and 3-0 in front of bank documents.  And

2    that is -- on the fraud scale, this isn't -- this is kind of

3    101 -- fraud 101.  It is not a white lie.  It is not, you know,

4    maybe I didn't commit a crime or I can sort of suggest that I

5    didn't -- this is altering bank documents to hundreds of

6    thousands of dollars and then submitting it to an entity to act

7    like you had a lot more money than you really had just faking

8    bank documents, actually adding zeroes to what was really in

9    there.

10           And then the underlying crime is very serious.  It is

11   a 10 million-dollar crime for Amazon.  It occurred over three

12   months.  They stole it really quickly.  They bought a

13   Lamborghini with cash -- with a cashier's check; a Tesla; a

14   Porsche; a truck; a motorcycle; a million-dollar house with

15   cash, you know, no down -- no mortgage.  It was 900-something

16   dollars -- the house was.

17           So they just burned through millions of dollars of

18   stolen proceeds that they stole over the course of three

19   months.  And so the guidelines are going to be significant.

20   Ms. Wortham is likely to get a role enhancement, over, you

21   know, a nine-and-a-half-million-dollar loss figure.  And so

22   these are very significant crimes.

23           The weight of the evidence we would submit is

24   extremely strong.  We heard from the Cru person today and from

25   the agent and from the evidence that was obtained from the

1   Clerk of Court.

2       Again, I didn't hear much argument back about why

3   that evidence doesn't show that these crimes that we're talking

4   about today were committed.

5       The Cru witness testimony was very credible; had no

6   axe to grind; explained exactly what happened.  We saw the

7   lies.  We see the emails.  We see the documents.  And we heard

8   the Clerk's assessment of how those were made.

9       And so we submit the weight of the evidence is

10   extremely strong.  That is true in the underlying crimes as

11   well.  Ms. Wortham has pled guilty.

12       Ms. Hudson -- I mean, we have the evidence of the

13   money going into accounts that are associated with her.  She's

14   driving the Lamborghini.  Those things have been seized.  And

15   so she is tied to the crime.  We have other witnesses who have

16   proffered about her involvement in the crime.

17       And so -- and she has proffered.  We have agreed not

18   to use that against her.  And so I won't rely on that today.

19   But the weight of the evidence against her is extremely strong

20   on both defendants on the underlying crime as well as what we

21   heard about today.

22       The third factor, history and characteristics of the

23   defendant.  Obviously we have -- the Amazon fraud is part of

24   their history and characteristics that we are here today on

25   with the bond revocation.

1          The other thing that statute talks about is were the

2    defendants on release during this crime.  And they were.  So

3    they were on bond from Your Honor and committed this crime --

4    brazen crime in my judgment while on release.  So that is an

5    aggravating factor under 3142(g).

6          And then finally the danger to community.  And that

7    is why the -- this is where the presumption has kicked in as

8    well because of the probable cause.  The danger to the

9    community includes not just violent crimes but economic crimes

10   as well.  And that is what the case law says.  And here we're

11   also talking about them taking actions that call, you know, the

12   integrity of the judicial process, the court, and the

13   prosecution into question in the community with entities like

14   Cru.

15         And so I just -- I would submit the evidence shows

16   they are capable of extreme fraud.  They are desperate.  I

17   think Mr. Lotito referred to the fact that this was impulsive

18   because they are desperate because they are coming up on a

19   sentence.

20         And I think that is part of the problem is they are

21   desperate and they are impulsive.  And that is part of the

22   concern of what would they do between now and a sentence -- a

23   March 8th sentencing or between now and however Ms. Hudson's

24   case is resolved because of that desperation and because of

25   that impulsiveness and because of that willingness to kind of

1    go to these lengths to commit fraud to achieve things to get

2    them out of these situations that they see are coming.

3           So, you know, the lengths that they are willing to go

4    to and the lies they are willing to take truly are brazen and

5    extreme.

6           And so that -- that's my assessment or the

7    Government's assessment of the 3142(g) factors.  Of course, we

8    don't have the burden on those.  The presumption is that

9    3142(g) is satisfied.  And the defendants have to rebut that.

10   I would submit nothing that they have presented today rebuts

11   that 3142(g) presumption.  And, in fact, the factors support

12   the Court finding that 3142(g) supports detention in this case.

13          The alternative to that 3142(g) is that the Court

14   finds that they are unlikely to abide by conditions of release.

15   And we would submit the evidence shows that.  This case shows

16   that.  They were on release.  And these were very few

17   conditions the Court put on them by our request.

18          And the Court did put the condition in there about

19   violating the law because that is kind of the -- that is level

20   one.  And they violated that condition, which is the lowest

21   condition I think the Court was comfortable putting on.  That

22   you at least have to do that and they violated that.

23          So I think the behavior in this case shows that they

24   are unlikely to abide by conditions of release if the Court

25   were to grant a bond.

1          The one thing that is a little unique about

2    Ms. Wortham is that Section 3143(a) also applies to her

3    situation.  She's pled guilty.  And 3143(a) says that when you

4    have pled guilty and you're awaiting sentencing you shall be

5    detained -- so it is similar -- unless the defendant by clear

6    and convincing evidence shows that they are not likely to flee

7    or be a danger to the community.

8          And so the burden is with Ms. Wortham to show that by

9    clear and convincing evidence.  So we would submit that that

10   burden has not been met.  The burden is on her.  And there it

11   is clear and convincing evidence, one of the highest burdens in

12   the law that she has to meet both prongs that she's neither a

13   danger nor a flight risk.  And we would submit the evidence

14   that that burden has been nowhere close to being met.

15         She's certainly -- there is evidence she's a danger

16   to the community in an economic sense, and that has not been

17   rebutted by clear and convincing evidence under 3143(a).

18         And so -- and so that is our presentation, Your

19   Honor.  We believe that under the law -- we do -- I appreciate

20   Ms. Hudson's mental state.  And I think that we have seen

21   evidence of that in this case from Mr. Finlayson.

22         I would submit that Deyton can and in my experience

23   has been able to take care of those types of issues.  And

24   certainly the BOP can.  And we certainly want no harm to her in

25   any way.

```
 1              And so if there's something the Court wanted to
 2     recommend to Deyton or to recommend to the BOP that she gets
 3     mental health treatment, we're 100 percent in support of that
 4     and certainly want nothing bad to happen to her in custody.
 5              But we do believe the statute applies.  And she
 6     should be held without bond, treated appropriately in Deyton
 7     and within the BOP.  But she is a risk of danger to the
 8     community and she's a risk of flight under the standard that is
 9     applicable here today.  And so we would ask that the Court
10     revoke her release and revoke her bond.
11              THE COURT:  Thank you.
12              Mr. Finlayson, any --
13              MR. FINLAYSON:  Just very briefly.
14              THE COURT:  Yes, sir.
15              MR. FINLAYSON:  Your Honor, I would beg to differ
16     with Mr. McClain.  I submit we have met our burden to rebut the
17     presumption.  Presumptions are rebutted in this -- on this
18     floor in this courthouse every day.
19              You know, every drug case we have, there is a
20     rebuttable presumption.  And we meet those burdens, and we do
21     rebut those presumptions.
22              You have heard evidence.  You have seen letters.
23     There is no -- been not an iota of evidence that Ms. Hudson is
24     a risk of flight.  And those were his last words, that she
25     might be a risk of flight.  She's not a risk of flight.
```

110

1            And the only concern before the Court is is she a

2    danger to the community.  And the only danger that we have

3    heard about that has been articulated and that anybody in their

4    mind is thinking about is the danger to the financial

5    community.

6            And, again, have we met a burden to show that there

7    are -- that there are no conditions that can meet that concern?

8    And there are conditions that can meet that concern.  You can't

9    have a financial transaction over $500 without approval of your

10   probation officer or the Court.  That will meet that concern.

11   24-hour-a-day lockdown in your house.  That will meet that

12   concern.  GPS monitoring.  That will meet that concern.

13           So this is -- I mean, I feel like we've gone from the

14   theoretical too far.  And these assumptions that she's going to

15   go out and figure out another financial scheme and rip off --

16   these are not lifetime fraudsters.

17           Mr. Lotito did a very nice job explaining his

18   client's life history.  And I'm not going to do all that right

19   now.  I think I mentioned before my client was a Division I

20   basketball player.  She was a Division I coach.  No prior

21   record.  Came up from a very hard situation.  Childhood was not

22   ideal.  Definitely has mental health issues.  Definitely needs

23   to have mental health treatment and a counselor that can give

24   her one-on-one counseling in a setting that is not Robert A.

25   Deyton.

1           And I can't even say -- with all due respect to the

2    mental health care at Robert A. Deyton, it is not going to be

3    adequate for this situation.  I mean, that -- that doctor -- I

4    mean, we were on the phone at 7:00 night before last.  I mean,

5    she cares, and she is dialed in, and she knows exactly what

6    she's dealing with with her.  And she -- her words are, you

7    know, Ms. Hudson is not going to be better off being in jail.

8           So I mean, that's -- you know, that is her view.

9    That is my view.

10          But, again, to meet our burdens, it is not like

11   climbing Mount Olympus or, you know, whatever, Kilimanjaro or

12   something.  The burdens can be met.  And I submit we have met

13   it.

14          Also I gathered from his argument our standard -- our

15   burden is a lower standard.  It is the preponderance standard.

16   And I submit we have clearly met that preponderance standard.

17   We don't have a clear and convincing standard because there has

18   not been a guilty plea in Ms. Hudson's case.  So that -- I

19   think -- you know, there is a distinction there.

20          I think also there are different roles in both of

21   these offenses.  Clearly in the Amazon, the underlying case --

22   in the Amazon offense, Ms. Hudson is not going to get a role

23   enhancement.  Her co-defendant will most likely get a role

24   enhancement.

25          You know, there are some things Mr. Lotito said that

1    is true.  I mean, there are some altruistic dynamics afoot in

2    that situation.  But, again, Ms. Hudson was not the leader.

3    She was not the organizer.  That scheme went on later in time

4    without Ms. Hudson.

5         So it is -- there are distinctions in the Amazon

6    fraud.  And there are distinctions in this -- in these

7    allegations.  You heard that it is very clear Ms. Hudson wasn't

8    getting a franchise.  Her name was not on anything.  She hadn't

9    signed a piece of paper.

10        Ms. Wortham was getting this Midtown franchise.

11   There was some talk of, hey, maybe Peters Street someday.  But

12   there wasn't -- you know, the roles were very different.  I'm

13   not going to argue that -- you know, I'm not going to argue --

14   spend a lot of time arguing about probable cause.  It is a very

15   low standard.

16        I think there is something that applies.  And I don't

17   want to go too much further than that.  But the roles there are

18   different.  And the involvement is different.  And Ms. Hudson

19   didn't go into the clerk's office and get exemplified copies.

20   Who exactly did what will probably be ferreted out as we go

21   along.

22        But I think the -- what I really want to focus on

23   here is are there conditions that can be imposed to guarantee

24   financial community safety.  And I think there are.  And I

25   submit we have met our burden and that it would be appropriate

1    to let Ms. Hudson go back home on house arrest.

2         THE COURT:  Mr. Finlayson, I'm going to look at

3    something in the statute before I hear from Mr. Lotito because

4    I may have a question for you that is a little distinct.  So

5    give me just a minute to take a look at that.

6              **(There was a brief pause in the proceedings.)**

7         MR. LOTITO:  I just have a few points, Your Honor.

8         THE COURT:  Yes.  If you'll wait just a moment.  I

9    might have some more questions for Mr. Finlayson.  Just a

10   moment.  I wanted to look at something.

11        MR. LOTITO:  I misunderstood what you said.  I

12   apologize.

13        THE COURT:  That is fine.

14             **(There was a brief pause in the proceedings.)**

15        THE COURT:  Yeah.  We're going to take a quick --

16   we're going to take a very brief recess for just a moment.

17   We've been going for two and a half hours maybe now.  We'll

18   take a brief recess, and I'll look at this.  I'll look at the

19   letters also you submitted.

20        MR. FINLAYSON:  Thank you, sir.

21        MR. LOTITO:  Thank you.

22             **(A brief break was taken at 5:11 P.M.)**

23        COURTROOM DEPUTY CLERK:  All rise.  Court is again in

24   session.

25        THE COURT:  Please be seated.  Before I get to

114

1    Ms. Lotito, Mr. Finlayson, come on up.

2            You had something else you wanted to add?

3            MR. FINLAYSON:  I do, Your Honor.  I have one more

4    fact to proffer.  I'm sorry.  I told Mr. McClain.

5            So another sister has just landed -- has flown in.

6            Ashley Hudson, can you stand, ma'am?  Thank you.

7            Your Honor, she just flew in from Dallas.  I'm not

8    going to have her testify.  I think she would say the same sort

9    of thing.  She will help support -- enforce any orders the

10   Court puts in.  But she is a family member and very concerned

11   and very -- you know, she just got off the plane.  So she is

12   here and would vouch for her sister.

13           THE COURT:  Okay.  Thank you.  You can just stay

14   there for just a minute because there was an argument that

15   Mr. McClain made.  I just wanted to look back at the statute to

16   make sure I was understanding it right and give you a chance to

17   respond to it.

18           As he articulated under 3148(b) -- you have a copy of

19   your code book there -- if the Court finds probable cause to

20   believe a federal, state, or local crime has been committed

21   while on release and then finds either (A) or (B) of subpart

22   (2), (b)(2)(B), the person is unlikely to abide by any

23   condition or combination of conditions of release.

24           I believe he is right about that.  I just wanted to

25   see if you had any disagreement with that in the alternative.

1          MR. FINLAYSON:  I think you have to -- you have to

2    find that by clear and convincing evidence.  I don't think I

3    have to rebut it by clear and convincing.  I think --

4          THE COURT:  No.  No.  I'm not saying -- no.  If I

5    find probable cause, then it is (A) or (B) after that -- if I

6    find probable cause and then I find she is unlikely to abide by

7    any condition or combination of conditions of release.

8          The rebuttable presumption is applicable too on the

9    probable cause.  But this is alternative to the 3142.

10          MR. FINLAYSON:  I agree.  I think it says that if the

11   Court finds that there is no condition or combination of

12   conditions that will assure the person will not flee or pose a

13   danger or the person is unlikely to abide by any condition.

14          So I guess you have to -- I would submit you have to

15   find those by clear and convincing evidence.  But I think we're

16   reading the same thing.

17          THE COURT:  Okay.  I don't think it has to be by

18   clear and convincing evidence though.  I don't think that is

19   the requirement.  But that is in Subpart (1) (B).

20          Okay.  Thank you.

21          Mr. Lotito?

22          MR. LOTITO:  Thank you, Your Honor.

23          THE COURT:  And just rebuttal for anything you want

24   to say.

25          MR. LOTITO:  Yes.  I have incredible respect for

1    Mr. McClain.  We have dealt with a number of cases over the

2    years.  And I hold him in high esteem as a worthy adversary.

3    But a couple of things he said were a little misleading.

4         The idea that the proceeds from this venture with Cru

5    Lounge were not intended to be used for restitution, I can only

6    say when I was representing Ms. Wortham we discussed this.  We

7    talked about the financial projection of 1.2 million a year;

8    that 600,000 in profit would solve both things of caring for

9    Destiny and also contributing to restitution.

10        My plan when I was in the case before was that with

11   the sentencing in March -- and it might be moved to a later

12   time -- there would be a several month track record to show

13   what the income was that I would be able to present at

14   sentencing and also provide -- you know, I have done this in a

15   lot of cases -- provide additional restitution at the time.

16   That was our intention, and that was Ms. Wortham's intention.

17        So, you know, I guess Steve has some reasons for

18   being skeptical.  But that was the intention.  And I'll state

19   that in my place.  And we had those discussions.

20        Second, he said that they seized a lot of things.

21   You know, we cooperated fully in turning over these cars.  You

22   know, we met out at the house where we cooperated in signing

23   over any bank accounts.

24        He referenced money that they seized after the fact.

25   That was a Wells Fargo account where we wanted to provide a

1  check for the money in that account.  But the account was

2  frozen.  So we said in a debriefing that that account had to be

3  seized.

4          So, you know, this is not like we were hiding the

5  ball or anything on all of the Amazon money.  And there was

6  some money that Kayricka had that she was able to use from her

7  employment both at Bosch and Amazon before all this happened to

8  pay this $260,000 toward this franchise.

9          So when I said that she was desperate and acted

10 impulsively, it was to preserve her interest in this franchise,

11 not because of fearing the sentencing in the Amazon case, which

12 is what he sort of suggested.

13         And he gave this analogy about buying the car and

14 then committing the fraud to pay for it.  She had already paid

15 $260,000.  She had paid several months' rent toward this

16 opening.  This club was intended to be opened earlier.  It was

17 going to be opened by now, and she would have been in business.

18         This all came up on one day -- all of the conduct

19 that they engaged in that may have been engaged in to

20 somehow -- that this hearing is based on it wasn't planned

21 for -- it was something that arose impulsively on a single day

22 to try to deal with these issues about this Amazon case that

23 were raised.

24         But she had already paid the money.  She would be a

25 pretty poor fraudster if she is defrauding them by paying them

1   $260,000.  That is what happened here.  I'm not saying what she

2   did was admirable, but it wasn't to defraud them.  It was to

3   preserve this investment.

4         The Section 505, again, it was a lawyer who was

5   forging documents from the court in the very proceeding where

6   he was representing the people.  This was -- whatever was

7   submitted here was not from the Amazon proceeding.  It was

8   again in unrelated -- it was with respect to this franchise.

9   Again, something that shouldn't have been done.

10        I believe that there was no -- there were very few

11  conditions.  Don't violate any laws.  And then this happened.

12  It doesn't show that there is no combination of conditions that

13  would prevent -- that would avoid another crime from being

14  committed.

15        Again, there is no right risk.  It is is she some

16  danger of committing a new offense.  And if she is on home

17  monitoring, she will at least have time before sentencing to

18  devise a suitable care arrangement for Destiny, her daughter.

19        She didn't even know where -- you know, who had

20  Destiny the day that she was arrested.  Because, you know,

21  again, this came up without any expectation.

22        Put her on home monitoring for a trial period.  If

23  there is the slightest problem or infraction or hint that she's

24  not abiding by all rigid conditions, she will have provided for

25  Destiny and gladly go back to jail.  That will never happen

1    now.

2           She will abide by any set of reasonable conditions

3    knowing the situation that she's in now.  Obviously we're going

4    to try to get money back from Cru and contribute that toward

5    restitution.  But that is not something that we need to worry

6    about here.

7           I don't believe that she's going to be a threat to

8    commit any new offense under suitable home monitoring.  She

9    could be confined to her house 24/7 if need be.  But at least

10   it would solve the problem of child care for Destiny and

11   satisfy the Court that -- and we could have also the financial

12   restrictions that Mr. Finlayson talked about.  No transaction

13   above $500 or something like that.

14          I think there is a combination of conditions.  She's

15   somebody that deserves another chance.

16          THE COURT:  Mr. Lotito, as Mr. McClain pointed out,

17   she's in a little different posture than Ms. Hudson because she

18   has entered the guilty plea.  And so she has a burden under the

19   statute of clear and convincing evidence, which is the highest

20   burden in court.

21          And so you want to speak to that?

22          MR. LOTITO:  Well, Your Honor, I mean, I'm not trying

23   to -- you know, if she were a lawyer or if she were an older

24   experienced person, you know, maybe what happened here -- and

25   I'm not trying to say it is not significant.  Obviously what

1    happened is something that -- I don't fault Mr. McClain for

2    filing the motion that was filed.

3              I wish I had been involved in the case, you know,

4    before that.  But, you know, she pled guilty, and she was

5    cooperating.  The only thing that she's done that was misguided

6    during her cooperation in my opinion was some of the court

7    filings that she made, and we're talking about rescinding those

8    filings.

9              No one here lost money because of what she did.  She

10   has worked hard, paid a lot of money to make this operation

11   run.  When she was presented with the idea of losing it in a

12   short time, she did some things that were misguided.  But it

13   wasn't to try to deprive someone of money.  I mean, I'm -- I'm

14   hoping that there are -- so far they have not been receptive to

15   the idea of returning her investment.  So it is quite the

16   contrary.

17             You know, she's the one that is not being -- and she

18   wasn't defrauding them.  They are claiming that the franchise

19   agreement allows them to do that.  But she never signed a

20   franchise agreement.

21             All the documents that are in evidence relating to

22   this don't make any misrepresentations about her case with

23   respect to Amazon.  I mean, perhaps there is -- it is

24   understood or something.  But it is not -- there is no

25   affirmative misrepresentation in those documents.

1        And I just think that, again, somebody that is a --
2   her age, a first offender -- there haven't been conditions that
3   have been imposed on her like home monitoring or house arrest.
4   Those conditions, I think, by clear and convincing evidence
5   would avoid any future problems.
6        THE COURT:  All right.  Thank you, Mr. Lotito.
7        MR. LOTITO:  Thank you.
8        THE COURT:  I'm going to begin with Ms. Wortham
9   because, as I indicated, the posture of her case is a little
10  bit different because of the fact that she has pled guilty and
11  the statute that indicates that she has the burden and the
12  circumstances of showing by clear and convincing evidence that
13  she's not going to pose a danger to the community or be a
14  flight risk.
15       But also even under the standard that we have
16  discussed with Mr. Finlayson under 3148, I do find that there
17  is probable cause to believe that Ms. Wortham has violated
18  federal and perhaps state law as well -- although I'm just
19  going to rely on the federal offenses now -- based on the
20  evidence that was presented today involving a scheme to obtain
21  something of value, that is, the franchise which she believed
22  would generate $1.2 million I think was the figure, 600,000 in
23  profit.  So that certainly had some value to her.
24       She did that while on bond.  And the only bond
25  conditions that she had was to not violate federal, state, or

1    local law.  Pretty straightforward.  Pretty simple.  And she

2    did not comply with that.

3         She seems to be a very accomplished fraudster by

4    pulling off a nearly 10 million-dollar fraud in the span of

5    three months.  That is pretty significant activity over a short

6    period of time and achieved a lot of money.  Only some of which

7    has been returned is my understanding.  A significant amount.

8    Not to downplay that.

9         So I don't think she has met her burden of showing by

10   clear and convincing evidence that she's not likely to commit

11   other crimes.  Putting her on home confinement with someone

12   with her intelligence and capabilities to commit fraud -- can't

13   detect that, can't prevent it.

14        It will be somebody else like Ms. Scott having to

15   take time out from her work to come into court if she were to

16   violate the law again and come in and deal with it and have the

17   prosecutors deal with it, the agents deal with it.

18        She was on very minimal terms.  And all she had to do

19   was comply with those terms.  She seems to have gotten caught

20   up in some way of trying to get herself out of having pled

21   guilty.

22        She's gone down this path that you have referenced,

23   Ms. Lotito, that is not going to be profitable for her and she

24   has made some very poor decisions.  As I said Friday -- I know

25   you were not here -- I regret -- I always regret in cases where

1    defendant's decisions impact their family and particularly

2    children.  And that unfortunately is what has happened here.

3            So I'm going to grant the Government's motion to

4    revoke her bond and order her detained pending her sentencing.

5            With respect to Ms. Hudson, the evidence today

6    likewise establishes her participation in conduct for which

7    there is probable cause to believe she committed new federal

8    offenses and perhaps state offenses as well as articulated by

9    Mr. McClain.  Specifically I was noticing the transmission of

10   the fraudulent documents.  Now there are two different sets of

11   documents.  One is a set of fraudulent bank statements, as

12   Mr. McClain pointed out, just a brazen inflation of the amounts

13   of money in the bank accounts with the purpose of trying to

14   obtain something from Cru.  Granted she didn't get to the point

15   that Ms. Wortham did in terms of transferring money.  But that

16   was her intent and purpose.

17           Whether that was for her to gain money for herself or

18   to gain money to pay restitution, it was to benefit herself

19   with those means.  And on top of that, she transmits the

20   document to try and address concerns that were raised by Cru

21   about these charges.

22           That is kind of the point to go back to Ms. Wortham

23   for a moment.  When Cru called it to their attention, that

24   could have been the jig's up and that would have been the

25   opportunity to step back and say, you know, we don't need to go

1        any further.

2             But, instead, they pushed further by offering these

3        fraudulent documents that do amount to aggravated identity

4        theft that does carry significant punishment.

5             And I think Mr. McClain made a very important point.

6        It attacks the integrity of the court in what they did.  They

7        misrepresented the actions of the court, misrepresented the

8        status of their cases, all for the desire to benefit

9        themselves.

10            And so I -- under the provisions that I discussed

11       with Mr. Finlayson, I do find probable cause.  I don't find

12       that she's likely to abide by any conditions or combination of

13       conditions of release given what I have seen today in the

14       evidence presented to me as well as the course of conduct that

15       is described with respect to the fraud of almost $10 million

16       against Amazon.

17            I do want her to receive treatment.  I said that in

18       court on Friday.

19            Mr. Finlayson, I'm glad to call the Marshal himself

20       and indicate that this is an issue and to make sure she gets

21       the treatment that she needs.  I think he will be responsive to

22       that.

23            So if you have any problems about that, please

24       contact me.  I want to know.

25            MR. FINLAYSON:  Yes, sir.

1            THE COURT:  If there's nothing further, court is

2      adjourned.

3                      **(The audio-recorded proceedings were thereby**

4                      **concluded at 5:33 P.M.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of
the United States District Court, for the Northern District of
Georgia, Atlanta Division, do hereby certify that the foregoing
125 pages constitute a true transcript of proceedings had
before the said Court, held in the City of Atlanta, Georgia, in
the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the
7th day of April, 2023.




                         _____
                         SHANNON R. WELCH, RMR, CRR
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT